In the Matter of the Probate of the Last Will and Testament
of AMOS F. ENO, Deceased.

LUCIUS H. BEERS and WILLIAM MITCHELL, as Executors,
etc., of AMOS F. ENO, Deceased, and Others, Appellants;
WILLIAM P. ENO and Others, Respondents.

First Department, April 8, 1921.

Wills — probate — evidence — attorney for testator not permitted to
disclose contents of draft copies of will — testator in showing
copies to third persons did not authorize attorney to testify —
draft copies and letters to attorney not admissible in evidence —
Appellate Division — evidence properly rejected below will not be
received by Appellate Division under section 2763 of Code of Civil
Procedure — opinion evidence as to mental capacity — inference
of mental incapacity from opinion evidence overcome by docu-
mentary evidence — appeal — Appellate Division cannot dispose
of case but must direct resubmission where verdict in Surrogate's
Court against weight of evidence — power of Appellate Division
reviewing decree of Surrogate's Court based on findings of jury —
witnesses — wife of nephew of testator who would take interest
in realty if will were denied probate is incompetent under section
829 of Code of Civil Procedure — witness not rendered competent
by adverse party asking question whether testator was present
at transaction — impeachment of witness — witness cannot be
directly impeached as to collateral matters — foundation for
contradicting testimony — sufficiency of proof to impeach witness
on ground that he endeavored to sell testimony — issue of undue
influence — striking out testimony bearing thereon when issue
withdrawn — destruction of written evidence — when presump-
tion that destroyed evidence was unfavorable does not arise —
charge — prejudicial error to so charge as to destruction of written
evidence that jury might base their findings thereon — improper
charge as to test of testamentary capacity and as to burden of
proof as to testamentary capacity — reading extracts from judicial
opinion in charge disapproved — verdict against weight of evidence.

The attorney who drew a will, but who was not a subscribing witness, will
not be permitted to make any disclosure in probate proceedings in respect
to the contents of draft copies of the will prepared by him on which the
testator had made certain memoranda and alterations.

A testator in showing the draft copies to a third person at the time he
received them from his attorney did not thereby waive, within the

meaning of section 836 of the Code of Civil Procedure, the pledge of secrecy and authorize his attorney to testify in reference thereto.

Draft copies of a will and letters written by a testator to his attorney are not admissible in evidence in behalf of the proponents of the will; and the mere fact that two words on one of the copies were in the testator's handwriting did not render the paper admissible.

While the Appellate Division has power under section 2763 of the Code of Civil Procedure to receive further testimony or documentary evidence upon an appeal upon facts from the Surrogate's Court, it will not receive documents in evidence which were properly rejected by the surrogate.

An opinion that a man has not sufficient capacity to enable him to sanely express his last will and testament has but little force, if he has drawn a will that shows that he had capacity to comprehend the nature and extent of his property, the nature of the act that he was performing, the name and identity of the persons who are the proper objects of his bounty, and his relation to them.

On all the evidence, *held*, that giving due weight to that produced by the contestants, any inference that might be drawn therefrom adverse to the testator's capacity is overcome by the actual demonstration of his mental processes as shown by the documentary evidence.

The question of the testator's mental capacity having been submitted to a jury, the Appellate Division, though it is convinced that the testator was of sound and disposing mind and memory when he prepared and executed his will and that a verdict finding that he did not have the required mental capacity is against the weight of evidence, cannot dispose of the case, but must direct a resubmission of the issue to a jury.

The Appellate Division in reviewing a decree of the Surrogate's Court based upon the findings of a jury has no more power than in an action at law; the verdict in probate proceedings is not advisory as in a suit in equity when issues are framed for trial by a jury.

The wife of a nephew, one of the heirs at law of the testator, whose husband would take an interest in the testator's realty in case the will were not admitted to probate, has an interest in the event of the action in that she would be entitled to an inchoate right of dower in the lands thus passing to her husband, and she is disqualified, under section 829 of the Code of Civil Procedure, from testifying concerning personal transactions with the testator.

Where a witness, disqualified under section 829 of the Code of Civil Procedure, is asked a question concerning a transaction without the question disclosing the presence of the testator, she is not rendered competent by the fact that the attorney for the adverse party asks the question whether or not the testator was present at the transaction; the fact of his presence or absence was necessary to be known in order that her competency might be tested.

A witness for the proponent of a will who volunteers his opinion that what the testator did and said on certain occasions was rational, and on cross-examination denies that he made certain former declarations expressing

generally opinions on the testator's testamentary capacity, his sanity, his general health and his intentions to make a very different will than that propounded, cannot be impeached by proof that he did make said declarations.

In order to lay a foundation for contradicting testimony it must be shown that the contradictory declarations are inconsistent with some material statement in the witness' direct testimony. Otherwise, if the witness answers the questions adversely, the cross-examining party is bound by the answers as they are collateral matters, and not subject to contradiction.

The former declarations of a lay witness by proof of which he can be impeached must not only be relevant to the issue, but must be matter of fact and not merely former opinions of the witness on the merits of the matters in controversy inconsistent with some different conclusions which the facts testified to by him may tend to establish.

In order to impeach the credibility of a witness on the ground that he had endeavored to sell his testimony, the evidence to show corrupt endeavor to sell his testimony must be direct and positive and not rest merely on inference and suggestion of counsel and the court.

It was improper to admit evidence to contradict testimony given by one of proponent's witnesses on cross-examination where the matters had not been brought out .on direct examination, for the contestants were bound by the answers given.

Where testimony is admitted solely as bearing on the issue of undue influence and that issue is subsequently withdrawn, the court should, on motion made by the proponents, strike out the evidence.

While the deliberate destruction of written evidence gives rise to the inference that the matter destroyed or mutilated is unfavorable to the spoliator, this unfavorable presumption does not arise from the mere destruction of documents, but it must appear that the documents were written evidence relevant to the issues, or at least the documents should be required to be produced upon the trial.

Where it was shown that a clerk from the office of the attorney for the proponents destroyed certain social letters, invitations, etc., of the testator in the presence of his housekeeper, but it was not shown that the destroyed documents were material and no demand was made for their production, and the court admitted such testimony as bearing " on the credibility of the proponents' case," it was prejudicial error for the court to so charge that the jury might infer from this fact alone, irrespective of the other testimony, that they might find in favor of the contestants.

It was error for the court in stating the test of testamentary capacity to read an extract from an opinion of the Court of Appeals which contained the following statement: " It is essential that the testator has sufficient capacity to comprehend perfectly the condition of his property, his relations to the persons who were, or should, or might have been objects of his bounty, and the scope and bearing of the provisions of his will," for a jury composed of laymen might very properly infer from the word " perfectly "

First Department, April, 1921.            [Vol. 196

that it must be a comprehension without reference to his books or a list of his investments; such a comprehension is not that required to constitute testamentary capacity.

It was error for the court, in charging on the burden of proof as to testamentary capacity, to charge that the rights secured to the heirs of a deceased person by the Statute of Descents and Distribution can only be divested by those claiming under a will and in hostility to them, by showing that the will was executed by a testator possessing a sound and disposing mind and memory, for the jury might gain the impression that the heirs had a vested or superior right to the property of the testator, of which hostile executors were attempting to deprive them, and think that it required more than a preponderance of evidence to justify the sustaining of the will.

It is better to charge a jury upon the burden of proof in a contested will case in the same language usually employed when giving such instructions in other cases. The reading of excerpts from judicial opinions in other cases is calculated to mislead rather than help the jury.

On all the evidence, *held*, that the verdict in favor of the contestants on the question of the testamentary capacity of the testator was contrary to the weight of the evidence and the decree of the Surrogate's Court should be reversed and a new trial granted on the question whether or not the testator was at the time that the propounded paper was executed of sound mind and memory and capable of making a valid disposition of his real and personal property.

SMITH and MERRELL, JJ., dissent in part, with opinion.

APPEAL by Lucius H. Beers and others from a decree of the Surrogate's Court of the county of New York, entered in the office of the clerk of said Surrogate's Court on the 21st day of August, 1916, on special findings and a general verdict of the jury, denying probate of a testamentary paper propounded as the last will and testament of Amos F. Eno, deceased, and also from an order entered in said clerk's office on the same day denying appellants' motion to set aside the verdict and for a new trial made upon the minutes.

*Henry deForest Baldwin* of counsel [*Francis Woodbridge* with him on the brief; *Henry deForest Baldwin*, attorney], for the proponents, appellants.

*William D. Guthrie* of counsel [*Wallace Macfarlane, Austen G. Fox* and *John B. Pine* with him on the brief; *John B. Pine*, attorney], for the appellant Columbia University.

*Joseph H. Choate, Jr.*, of counsel [*Evarts, Choate & Sherman,* attorneys], for the appellant American Museum of Natural History.

*John B. Stanchfield* of counsel [*Nathan L. Miller, William Nelson Cromwell, Philip G. Bartlett, Julius F. Workum, Charles Albert Perkins, Arthur C. Train, Clarke M. Rosecrantz* and *Philip L. Miller* with him on the brief], for the respondents.

PAGE, J.:

Lucius H. Beers and William Mitchell, executors named in the alleged will of Amos F. Eno, propounded the same for probate. The testator's next of kin, consisting of his brother, William P. Eno, his sister, Antoinette E. Wood, his nephews, Henry L. Eno, Gifford and Amos Pinchot, his nieces, Antoinette E. Johnstone, Florence C. Graves and Mary P. Eno, to whom and their children the testator in the propounded paper bequeathed absolutely and on contingent trust over four and a half million dollars, filed objections and demanded a jury trial. On these objections the following questions were duly framed for trial by a jury:

I. Is the said propounded paper the last will and testament of the decedent Amos F. Eno?

II. Was said propounded paper executed pursuant to the requirements of the statute in such case made and provided?

III. At the time when said propounded paper purports to have been executed (if ever executed) was Amos F. Eno of sound mind and memory and capable of making a valid disposition of his real and personal property, and did he have testamentary capacity?

IV. Was the execution of said propounded paper by the said Amos F. Eno (if ever executed) caused or procured by the improper and undue influence of the proponents, or one of them, or some other person or persons unknown to these contestants in behalf and in favor of Columbia University in the city of New York to the end that it was made the residuary legatee therein?

The proponents presented their proof in support of the due execution of the will and of the testamentary competency and freedom from restraint of the testator at the time of the

execution. The contestants proceeded with their case. At the close of the contestants' case the proponents moved the court separately as to each question, to withdraw the question from the jury and to dismiss the objection on which it was founded. The court granted the motion in respect to question II, and denied the motions as to the other questions and objections, and the proponents excepted to these denials. At the close of the whole case, the proponents moved the court to direct a verdict in favor of the will on each remaining question. The surrogate denied the motions as to the first and third questions and withdrew the fourth question from the consideration of the jury.

Amos F. Eno was born on June 13, 1837, and died October 21, 1915. He was, therefore, at the time of his death seventy-eight years, four months and eight days of age. The paper that was propounded as his last will and testament was executed on June 18, 1915. He was the son of Amos R. Eno, who died in his ninetieth year in 1898, leaving an estate of about $18,000,000, of which Amos F. Eno received $3,161,446. The contestants and the parents of the contestants received from the estate of Amos R. Eno $14,561,759. For many years prior to his father's death Amos F. Eno's occupation was assisting in the care and administration of his father's property. The fortune which he inherited when he was sixty-one years of age increased year by year, and at the time of his death amounted to something over $6,000,000 of personal property and ninety parcels of real estate in New York city assessed for taxation at $4,792,500. He managed his own property, made his own investments, personally made all contracts relating to his property, and engaged in no other business. He made at least eight wills which were put in evidence in this proceeding. In the last one prior to the one propounded for probate, dated January 9, 1914, he named as residuary legatees his brother, Henry C. Eno, and his sister, Mrs. Pinchot, with substitution in favor of their issue if the testator should survive them. During the year 1914 his brother and sister both died, and because of this fact he stated on more than one occasion that he would have to draw a new will. In November or December, 1914, he told Surrogate Fowler that he had something in view in connection with

some charitable disposition of his property and Fowler told him that he thought the best disposition of his property was to his family, to which Eno replied that he thought that might be so as to property which he had inherited. Some time in April or May, 1915, Mr. Eno commenced making preparations for the drawing of his will. He first obtained a statement from his office showing the disposition of his father's estate under his last will and testament to the various members of his family. He also obtained from his office a statement of the securities owned by him and the several parcels of real estate which he possessed, ninety in number, and had set opposite each parcel the assessed value thereof for the purpose of taxation. He then entered upon the blank pages of his diary, into which he had copied the statement of his estate, the names of all the living descendants of his father, Amos R. Eno, and set opposite to their names figures that would tend to show the amount which he intended to bequeath to each. From these notes was prepared a draft of the will. The will was drawn by Lucius H. Beers, a member of the firm of Lord, Day & Lord, who had drawn a number of Amos F. Eno's previous wills. The first draft was made May 25, 1915, and sent to Mr. Eno. He made memoranda and notations thereon and returned the same to Mr. Beers. In this manner there were prepared three other drafts, each of which was submitted to Mr. Eno and by him revised, corrected or changed at his home and by him returned to Mr. Beers, and on June 18, 1915, the final draft was executed and is the paper propounded for probate. In this will were mentioned all living descendants of Amos R. Eno who also were the heirs at law and next of kin of Amos F. Eno, and bequests either outright or in trust made for each. In this manner there was disposed of $4,600,000 of the testator's estate. Other legacies were given to distant relatives and friends, amounting to $100,000; to employees and servants $24,000; and to charities as follows: Metropolitan Museum of Art, $250,000; American Museum of Natural History, $250,000; Association for Improving the Condition of the Poor, $250,000; New York University, $250,000; New York Public Library, $50,000; and after all other legacies were paid and all trusts established, there was left to the General Society of Mechanics and

Tradesmen, $1,800,000, "or so much of that as my estate will suffice to pay." These legacies amounted to $2,974,000, and the residue of the estate was left to Columbia University. On the proceedings for the probate of the will it was proved beyond question and was not seriously contested, that the will was executed pursuant to the requirements of the Statute of Wills (Decedent Estate Law, § 21), nor was any evidence produced that the execution of the will was caused or procured by improper and undue influence, and these questions were properly disposed of by the learned surrogate.

The sole question, therefore, that remained and which was submitted to the jury was whether Amos F. Eno at the time of the execution of this will had testamentary capacity. As I understand the rulings of the surrogate upon the motions to direct a verdict, he decided that the first question was dependent entirely upon the answer to the third, and did not intend thereby to submit any other or different issue to the jury.

Before entering upon the discussion of the evidence of testamentary capacity, I will consider the exceptions taken to the sustaining of the objection to the production and identification by Lucius H. Beers of the three drafts of the will, and of certain letters received by him from the testator. Beers was called to the stand by the proponents and asked to produce the second, third and fourth draft copies of the will for the purpose of showing the memoranda and alterations made thereon by the testator. Objection was made and sustained. The proponents claim that this was prejudicial error, as these documents, if produced, would tend to show that the testator took active part in the preparation of the will, and that the various devises and bequests were in accordance with his express desire, and that the residuary legatee, Columbia University, had been selected by Amos F. Eno and not by Beers as had been charged. The rule at common law was that the communications made by a client to his attorney to enable him to draw a will were confidential and could not be disclosed during the lifetime of the client; but after the death of the client the attorney was at liberty to disclose all that affected the execution and tenor of the will, for the purpose of supporting the will. He was not allowed to testify to

circumstances tending to show lack of testamentary capacity, or undue influence, or other facts tending to defeat the probate of the will. (See 4 Wigm. Ev. § 2314.) The common-law rule was adopted and in force in this State prior to the enactment of sections 835 and 836 of the Code of Civil Procedure. (*Sanford* v. *Sanford,* 61 Barb. 293, 304; *Sheridan* v. *Houghton,* 16 Hun, 628; affd., 84 N. Y. 643; *Matter of Chapman,* 27 Hun, 573, 574.) It seems to have been assumed that section 835 was only intended as a codification of the common-law rule, as that rule was applied subsequent to the adoption of the Code. (*Matter of Chase,* 41 Hun, 203; *Matter of Austin,* 42 id. 516, 518; *Hurlburt* v. *Hurlburt,* 128 N. Y. 420, 424.) Prior to the amendment of section 836, hereinafter stated, the Court of Appeals held that " A lawyer, in receiving the directions or instructions of one intending to make a will, is confided in by reason of his professional character as a counsellor, and he acts in that capacity, although asking no questions and without advising, he does nothing more than to reduce those to writing," and that he could not testify to such instructions by reason of the inhibition of section 835. (*Loder* v. *Whepley,* 111 N. Y. 239, 248.) In *Matter of Coleman* (111 N. Y. 220) the court held that the prohibition of section 835 against the disclosure by an attorney of a communication by his client to him, or his advice thereon, applied to instructions given by one proposing to execute a will to an attorney employed to draw it; but that the testator, by requesting the attorney to become a witness to the will, waived, within the meaning of section 836, the pledge of secrecy and authorized the attorney to testify " unrestrained by any objection that he had the power to remove."

By chapter 514 of the Laws of 1892 section 836 of the Code of Civil Procedure was amended by the insertion of the sentence "But nothing herein contained shall be construed to disqualify an attorney on the probate of a will heretofore executed or offered for probate or hereafter to be executed or offered for probate, from becoming a witness as to its preparation and execution in case such attorney is one of the subscribing witnesses thereto," thus giving legislative sanction to the rule declared in *Matter of Coleman* (*supra*). It may now be considered the settled law of this State under sections

835 and 836 of the Code of Civil Procedure that " except he is an attesting witness to a will, in no case is an attorney permitted to make disclosure in respect to the contents of any documents or other information communicated to him in the course of his professional employment by his client." (*Butler* v. *Fayerweather*, 91 Fed. Rep. 458, 461; *Matter of Cunnion*, 201 N. Y. 123.) Some of the cases upon which the appellants rely were decided before the enactment of the amendment to section 836 of the Code of Civil Procedure. In the citation of authorities on this question regard should be had for the date of the trial of the case in which the admissibility of the evidence was determined.

The case of *Baumann* v. *Steingester* (213 N. Y. 328), relied upon by the appellants, is not contrary to the authorities above cited. In that case, *first*, the attorney was a sub-scribing witness to the will and hence competent within the reason of section 836 of the Code of Civil Procedure; *second*, when the testatrix called upon the attorney and gave him instructions as to the drawing of her will she was accompanied by a person who lived with her and acted as companion and housekeeper, who was present when the instructions were given to the attorney by the testatrix. The court held that giving the instructions in the presence and within the hearing of the third person was a circumstance indicative of the fact that the communication was not made in confidence, the court saying: " The communication not being confidential, the attorney is not privileged from disclosing it. Where there is no confidence reposed, no privilege can be asserted. In such cases the attorney is permitted to testify not because the privilege has been waived, but because the communication, not having been made in confidence, was not privileged."

The appellant argues that Mr. Eno in showing these draft copies to Mrs. Desperrins at the time he received them took them out of the category of confidential communications. The distinction is obvious. The draft returned was a communication from the attorney to the client which the client was at liberty to disclose. It was not a communication by the client to the attorney. I presume that it would not be contended that if a testator exhibited his will to a third person he thereby unsealed the lips of the attorney as to the con-

fidential communications made by the client to the attorney for the purpose of having the will drawn. Yet such would be the logical conclusion of the application of the rule contended for by the appellants.

The appellants further cite *People* v. *Farmer* (194 N: Y. 251, 269) as an authority for the proposition that a voluntary disclosure by the client of the facts relating to a transaction with an attorney waives the protection of section 835 of the Code of Civil Procedure. In that case the defendant procured the lawyer to draw a deed conveying property belonging to one Sarah Brennan to the defendant's husband. She stated to the lawyer that she was Sarah Brennan and she signed the deed and acknowledged the execution thereof before him as a notary public. The defendant later killed Sarah Brennan. Subsequent to the homicide the defendant admitted in the presence of the attorney and others that she had stated to the attorney at the time of the execution of the deed that she was Sarah Brennan and had executed and acknowledged the deed. The attorney on the trial of the defendant for the murder of Sarah Brennan was allowed to testify that she said to him at the time that she was Sarah Brennan and that she signed the deed and acknowledged it before him as a notary public. The court gave three reasons why the evidence was admissible:

1. "After such a voluntary disclosure by the defendant of the facts relating to the transaction the protection of said section of the Code is waived, at least to the extent of such voluntary disclosure."

2. "The section of the Code mentioned was not intended to prohibit the disclosure of a communication so far as such communication is necessary to enable a public officer to act in his official capacity."

3. "That the seal of personal confidence can never be used to cover a transaction which is in itself a crime."

The last reason would have been sufficient to render the evidence competent. It is to be noted, however, that the communication to which the attorney testified was made to him upon the signing and acknowledgment of the deed before him as a notary public, and it must be that the second reason given by the court meant that a disclosure made to the

First Department, April, 1921.                [Vol. 196

notary public to enable him to act in his official capacity was not privileged because the notary public also happened to be a lawyer. No evidence was allowed to be given in that case of any statement made by the defendant to him as a lawyer or any advice given by him to her. The testimony was limited to statements made to him in his capacity of a notary public.

The exclusion of the draft copies of the will and of the letters produced by Mr. Beers was the proper disposition of the matter.

An interesting question might have been presented had Eli G. Partridge, who was a clerk in the office of Mr. Beers, been called upon to identify the draft copies as received from Mr. Eno. The inhibition of section 835 applies to a clerk, stenographer or other person employed by the attorney. Partridge was a subscribing witness to the will. Would the same rule which was applied to the attorney who was a subscribing witness in *Matter of Coleman* (*supra*) be applicable to an attorney's clerk similarly situated? We do not consider this question as it is not before us. Partridge was merely asked to identify the words " Columbia University " as in the handwriting of Mr. Eno, which he did.

The paper was offered in evidence and properly excluded. The mere fact that two words on a paper were in the testator's handwriting did not render the paper admissible in evidence. Nor were the drafts of the will identified by Mrs. Desperrins as those shown her by Mr. Eno. In this condition of the proof the learned surrogate did not err in excluding the drafts of the will. We are urged by the appellants to receive these drafts of the will in evidence on this appeal. This power of the Appellate Division in its discretion to receive further testimony or documentary evidence upon an appeal upon facts from the Surrogate's Court is expressly conferred by section 2763 of the Code of Civil Procedure. There is no new or further evidence offered in this court, nor are we asked to take such evidence. What we are asked to do is now to receive documents in evidence which were properly rejected by the surrogate. The same defects in proof that prevented their reception on the trial would prevent our admitting them in evidence on the appeal. If we had decided that upon the

evidence before him the documents were admissible and his exclusion of them was erroneous, we undoubtedly could receive them in evidence on this appeal.

The contestants claim that Amos F. Eno in the last years of his life was suffering from senile dementia, which had developed to such a stage that he lacked testamentary capacity. In January, 1914, he had made a will in which all of his bequests, except one of $2,000,000, to the General Society of Mechanics and Tradesmen of the City of New York, were to friends, relatives and employees. The residue of his estate he devised and bequeathed to his brother, Henry C. Eno, and to his sister, Mary Eno Pinchot, with substitution in case of their death before his decease to their descendants. The contestants offer this will for probate, thereby certifying that at the time of its execution he was of sound mind and disposing memory. In our consideration of this case we may assume that up to this time his manner of life, his habits, eccentricities and peculiarities, were those of the normal Amos F. Eno, and by this standard judge his subsequent acts. He managed his own estate, which consisted largely of real property in the city of New York, attending to all the details of repair, negotiations of leases, and paying of bills. He had an office in which were two employees, whose duties were purely clerical. In his business dealings he was exact and exacting. His contracts he performed to the letter, and demanded of others equally strict observance of their obligations; he gave and required no less and no more than the exact terms of the agreement imposed. With those who would submit, he was inclined to be arbitrary and overbearing. In dealing with his real estate, he was averse to expenditure of money in improvements and by reason thereof many of his properties became vacant and unproductive. For his profits he depended more upon appreciation in value than on an increase of rental. He was a shrewd and capable man of business. Inheriting $3,161,446 when he was sixty-one years of age, in seventeen years he had increased his estate to over $6,000,000 of personalty and ninety parcels of real estate assessed for taxation at $4,792,500.

Although a bachelor he maintained a house on the corner of Fifth avenue and Tenth street in the city of New York and

a country place at Saratoga. He kept six or seven servants besides a housekeeper and valet. He was a member of several social clubs in the city of New York, the Golf Club and Racing Association of Saratoga and the Jekyl Island Club of Georgia. He entertained largely and rarely dined alone, either having guests at dinner or being a guest of his friends; and scarcely a day passed that he did not call or receive callers. He was fond of travel and went abroad frequently. He dressed quietly and with care; in deportment he was punctilious. In short he was companionable and fond of society. With men he was apt to be obstinate and overbearing and was a man of strong will and strong prejudices. He was fond of joking and saw humor in making remarks calculated to tease and annoy. He had a zest for amassing wealth and was inclined to judge men by their ability to acquire it. He was proud of his Connecticut ancestry, saying that he came of a hard-fisted, hard-headed race that had made its money from the stony soil of the worst State in the Union. He had the traditional instinct of the race for bargaining and close scrutiny of expenditures. As he stated of himself, he possessed the faculty of " squeezing a quarter until the eagle on it squealed." He would question a bill of his doctor for ten dollars and yet offered to buy a house in Saratoga and allow the doctor to occupy it on payment of taxes for a year or more. He paid for services rendered and considered all obligation on account thereof satisfied by payment; nevertheless he was delighted in making gifts to friends. He disliked requests for contributions yet he made substantial gifts to enterprises that met his approval. His principal benefactions were given without solicitation and without personal communication with the object of his bounty. During his whole life he was ready to say as an excuse for not doing what he did not wish to do, that he could not afford it. It was a favorite joke, when in the company of friends, to pretend to be poor and refuse to make a purchase of some cheap article and tell the salesman that he could not afford to pay for it. Notwithstanding this well-known characteristic, the same statement made in the last year of his life is presented as a delusion evidencing senile dementia. The joke of middle life becomes the tragedy of age. Mr. Eno's health was generally

good. In the nineties he had some trouble from gout and had taken several trips to Europe on this account. Subsequently he had trouble with his bladder and his prostate gland, which resulted in an operation and the prostate gland was removed in December, 1906. He was critically ill after the operation. Dr. Wylie, his physician for many years, and a witness for the contestants·in this proceeding, testified that before this operation Mr. Eno was very cheerful but after that trouble developed he was only cheerful at times. In 1908 a cataract developed in the right eye. This was removed by an operation performed by Dr. Wilmer in Washington, D. C., in August, 1913. In October or November, 1913, the resultant operation of " needling " was performed by Dr. Wilmer in Washington. As early as 1908 a cataract was discovered in the left eye, but it had not developed sufficiently for an operation. It had, however, increased in 1914. This impairment of vision necessitated the wearing of strong glasses and he also carried a magnifying glass in his pocket which he used in reading. He also used a piece of black hard rubber with a slit in it so that when placed over printed or written matter only one line at a time would be visible. The purpose of this was to prevent the reflection of light from the paper into the eye. Dr. Wylie testified that at the time he had this trouble with his eyes he was depressed and somewhat despondent and that the operation was not entirely successful.

On January 10, 1914, Mr. Eno accompanied by his valet sailed for Europe. With him on the steamer were Dr. Wilmer and his wife and daughter. An intimate and detailed account of Mr. Eno's life from the date of his sailing to that of his return, June 30, 1914, was given by Bigaut, the valet, a witness for the contestants.

After spending a few hours at Monte Carlo the party went to Menton and stopped at the Westminster Hotel. Bigaut characterized this as a second-class hotel and said that previously Mr. Eno had stopped at a large first-class hotel. This change of grade of hotel at Menton and other places on this trip is relied upon as showing a growing penuriousness in Mr. Eno. While that seems to have been the impression made upon Bigaut, he gave an explanation entirely at variance

with it, for he said: " Mr. Eno did not like to go to this hotel but Dr. Wilmer asked him to go with him, and for pleasure to Dr. Wilmer Mr. Eno went with him." While at Menton he wrote to a friend in Nice to get accommodation for him in the hotel in which he was stopping, as he did not like the Hotel Ruhl; but on arrival he found that his friend had reserved a sitting room, bedroom and bath for him at the Ruhl. He told Bigaut to find out the price of the rooms. Bigaut failed to do so and testified that he would not do such a thing. Mr. Eno, greatly to Bigaut's chagrin, went himself to the office and " he was excited," Bigaut testified, " and made so much noise about the price." The price was twenty dollars a day, and he said he would not stay so long as he expected to stay. When Bigaut was asked, " Why did he say he would not stay so long as he expected to stay? " the answer was, " Because he did not like this hotel; it was too many people." They had expected to stay a month and stayed two weeks. At the conclusion of his stay at Nice Mr. Eno suggested going by day train to Rome, saying that Bigaut could go second class. This impressed Bigaut as a very irrational proposition and he objected. He testified that Mr. Eno made two visits to the ticket office in one day to obtain tickets, insisting that the price given him at the first was not correct and stating that the agent did not know his business and that he would return when another agent was there; that he came back later and discovered the same agent; that on the next day he returned, and obtaining the same price from a different agent, paid for tickets and accommodations on a night train. Mr. Eno had contracted a cold in Menton and a friend had objected to his plan for a day trip on the ground that he was ill and should go at night and have his valet with him that he might wait on him. This incident is made much of by the contestants. Subsequent events showed that the day trip might have been preferable, for during the night he added to his cold and arrived in Rome ill. Instead of going to the Hotel Excelsior, a very large first-class hotel where he had usually gone, he stopped at the Hotel Regina which Bigaut said was second class. At the Regina he had to wait until three o'clock in the afternoon before he could obtain a bedroom and bath. His illness developed into bron-

chial pneumonia, and he was confined to his bed in his room for about three weeks, the doctor calling twice a day. The doctor's bill was $120. He criticised it as too large, and laughing said he was a poor man. From Rome he went to Naples and stopped at the Santa Lucia Hotel which Bigaut said was not second class, " but not first class no more." There he changed from his first suite to one having a smaller sitting room which was cheaper. Returning to Rome he stopped for two nights at the Hotel Terminus, a railroad hotel in connection with the station. The reason Bigaut gives for this is that he did not want to pay for transporting four trunks back and forth. He continued his trip to Mentone where he stopped nearly a month; to Paris for a week; to Vichy for the baths where he remained twenty-three days; to Paris for ten days; thence to Antwerp, whence he sailed on June 20, 1914, on the steamer *Kroonland* for New York. During this period the hotels at which he stopped seem to have met with Bigaut's approval, as no further criticism is made either of the character of the hotel or the prices paid. Evidence was given of two incidents during this period, which contestants claim tends to show the development of a penurious disposition. While in Paris he went to Charvet's, where he had purchased his linen, and inquired whether new cuffs could not be made in place of those that had become worn; on being advised against it, he ordered new shirts made. At Vichy he had formerly given his bath attendants four dollars each and on this occasion gave them one dollar each, and the attendants expressed their dissatisfaction to Bigaut. These incidents, together with a letter written to the housekeeper suggesting the discharge of a cook, comprise the evidence of the penuriousness alleged to have been exhibited by Mr. Eno during his trip abroad. After his return a few more incidents were shown. He refused to keep a carriage at Saratoga. While at Jekyl Island he had invited Amos R. E. Pinchot and his family to visit him but refused to pay their laundry bills or charges for horseback riding, stating that he would only pay for their board. He objected to strawberries at one dollar per box. He complained to his housekeeper of the increased cost of provisions in the summer of 1915. On the other hand, his mode of life was the

First Department, April, 1921. [Vol. 196

same; he maintained the same elaborate household in New York and Saratoga. When his health permitted he entertained as lavishly as before. There was no stinting of his board. He purchased his clothing, shoes and linen from the same expensive merchants as formerly. Although he refused bruskly and sometimes insultingly solicitation for contributions to worthy objects, nevertheless he gave without solicitation during this period $10,000 to the Saratoga Hospital and real estate to the General Society of Mechanics and Tradesmen of the value of about $150,000. He criticised the doctor's bill in Rome for $120; but at a time when the contestants admit his sanity he had objected to a doctor's bill of $10. We find in his earlier life these same contradictory evidences of penurious and generous acts. In my opinion there was very little evidence of an increasing penuriousness and in that nothing tending to show a lack of testamentary capacity.

On the return voyage from Europe he met with an accident. Bigaut testified that for three years he had walked with a cane tapping the pavement or floor ahead of him, and not lifting his feet, but shuffling them along on account of the impairment of his vision; and at this time he had not recovered his strength after his illness, so was feeble in his legs. In attempting to go down the companionway stairs he fell and rolled down two flights of steps, cutting his head, lacerating his leg and injuring three of his ribs. A doctor was called and treated his injuries and he remained in his berth until he arrived at New York, but there he insisted on walking from the boat to the dock. The contestants claim that the illness in Rome and this fall on the steamer completed the mental wreck of Mr. Eno. His business activities, the performance of his social duties, his ability to converse intelligently with friends, are but the meanderings of the mind along beaten and accustomed paths, requiring no mentality. His cunning in being able to conceal his mental condition from friends whom he casually met (the proponents' witnesses) and to so conduct himself in deportment and conversation as to lead them to think that there was but little change in him, was but a further proof that the man was a senile dement. It would exceed the reasonable length of an opinion to attempt to review the evidence in any detail.

Mr. Eno was well advanced in years, his eyesight and hearing were impaired. He had been physically and possibly mentally weakened by his accident. On occasions he was less careful in his dress than he had been formerly, refusing to dress for dinner when alone at Saratoga and appearing with unbuttoned clothing on one or two occasions. He was inclined at first when he returned from Europe to dwell unduly upon his illness and accident and sometimes to repeat the story of the accident to the same person. He failed to remember faces. He gave vent to ebullitions of temper which impressed the witness as irrational. He heaped unrestrained abuse on some of the woman suffrage leaders, calling them by opprobious and indecent names in mixed society. When alone he was at times depressed. He suffered from certain physical weaknesses which resulted in unfortunate accidents. He treated his valet who had been with him for nine years familiarly and submitted to familiarities from him. The contestants produced as their witnesses his housekeeper, his valet and his physician, those most intimately associated with his life, relatives and acquaintances. By picking out incidents, insignificant in themselves tending to show no continuity of conduct, and by ignoring the general trend of the testimony, counsel was able so skillfully to bring together those separate incidents and place them in such a way as to show a continuous and progressive mosaic picture, in a hypothetical question that would enable the medical expert to answer affirmatively that Mr. Eno was suffering from senile dementia and lacked testamentary capacity.

On the other hand, there was presented testimony of friends and intimate acquaintances and persons who came in contact with him in business transactions. We have the evidence of the actual operation of his mind, as disclosed by his business and social letters before and after the execution of the will of January, 1914, and we have the will which he prepared in 1918, executed June eighteenth, which is offered for probate. We also have the testimony of medical experts of equal eminence with those of the contestants, based upon hypothetical questions, that Mr. Eno showed no signs of senile dementia, and had testamentary capacity. With this conflict of evidence it becomes important to consider its probative force.

First Department, April, 1921. [Vol. 196

As Mr. Justice FOLLETT said: "The experience of courts has demonstrated that the answers of experts, though honestly given, to hypothetical questions embracing pages of assumed and isolated facts covering a long lifetime, about which facts the experts have no personal knowledge, are the weakest and most unreliable kind of evidence in respect to the sanity or insanity of the person inquired about." (*Dobie* v. *Armstrong*, 27 App. Div. 520, 526; affd., 160 N. Y. 584.) The weight to be given to the opinions of non-professional witnesses depends largely upon the length and intimacy of the acquaintance, the intelligence of the observer, and whether the facts stated justify the conclusion. (*Seaman's Friend Society* v. *Hopper*, 33 N. Y. 619; *DeWitt* v. *Barly*, 17 id. 340, 351.) In contrast with evidence of this character, we have the results of the operation of Mr. Eno's mind embodied in the will and in his letters. An opinion that a man has not sufficient capacity to enable him to sanely express his last will and testament has but little force, if he has drawn a will that shows that he had capacity to comprehend the nature and extent of his property, the nature of the act that he was performing, the name and identity of the persons who are the proper objects of his bounty, and his relation to them.

The will was not the result of a sudden impulse but of a definite purpose, formed some months before it was executed. Because of the death of his brother and sister, of whom he was most fond, who were the residuary legatees in the will of January, 1914, he expressed the determination to make a new will and gave this fact as the reason for so doing to several persons. He spoke to Surrogate Fowler of his purpose and of making some charitable disposition of his property. The latter replied that he thought the best disposition the testator could make of his property was to his family. Mr. Eno said he thought that might be so as to the property he had inherited. The purpose thus expressed some months before he prepared the will was carried out and is reflected in the paper propounded for probate.

He first obtained from his office a memorandum of the disposition of his father's estate by his will showing the division of $17,723,205 of that estate among his father's descendants and the substantial equality of distribution

provided for in the will. From this estate Amos **F. Eno** received $3,161,446. He next obtained a list of his own investments of personal property and placed values on each block of securities. He then obtained a list of his real estate holdings and the amount at which each parcel was assessed for taxation. He recorded in certain pages of his diary for 1915 the process he went through in arriving at a conclusion with respect to the beneficiaries he named in his will. In these diary notes the testator has written every substantial provision of this will except the terms of the trusts and the name of the residuary legatee. His testamentary plan was communicated to his attorney who made and submitted to him no less than four tentative drafts which Mr. Eno studied and corrected or changed and returned to the attorney. This deliberate and careful preparation of the will indicates capacity to appreciate the business in which he was engaged and the elements of the business to be transacted, and ability to hold them in his mind a sufficient length of time to perceive their obvious relation to one another and to form a rational judgment in relation to them. The final result displays a highly intelligent purpose admirably carried out. The details were worked out in his library without the presence or assistance or suggestion of any one. The will shows a careful plan, deliberately and intelligently carried out. His prior expressed intention of leaving to the members of his family what he inherited is shown in that he distributed $4,600,000 among all the living descendants of his father. His sister Mrs. Woods and his nephew Henry Lane Eno, for whom he had not provided in some previous will, were given $50,000 each. His other nephews, his nieces and his brother William P. Eno were to receive $250,000 each, while trusts of $250,000 were provided for each of his grandnephews and grandnieces, except that Amos R. Eno, the son of Henry Lane Eno, had a trust estate of $1,500,000 and the family homestead at Simsbury, Conn.; $100,000 was to be distributed to more distant relatives and friends. Among employees and servants in his employ at the time of his death $24,000 was directed to be distributed. To the Metropolitan Museum of Art, American Museum of Natural History, Association for the Improvement of the Condition of the Poor and the New

York University was given $250,000 each; to the Public Library his extensive collection of prints of old New York and $50,000; to the General Society of Mechanics and Tradesmen was left $1,800,000 " or so much of that as my estate will suffice to pay."

The residuary estate was left to Columbia University, to which was also given the reversionary interest in case the life beneficiaries of certain of the trusts should die without issue.

For such discrimination as appears in the lack of equality of distribution to certain of his relatives, good and sufficient reason appears. His sister Mrs. Woods was advanced in years, wealthy, widowed and childless. In his wills of 1895, 1900, 1902 and 1906 he had made no provision for her. There had been a dispute between them as to the payment of taxes on improvements that she had made against his will on the Simsbury place of which she had a lease from him for her life. His diary shows that he first contemplated giving her $50,000, later increased the legacy to $100,000, and finally placed it at $50,000. This shows care and deliberation. On the advice of Henry Lane Eno, his father, Henry C. Eno, had demolished the Fifth Avenue Hotel and in place erected a large office building against the protest and opposition of Amos F. Eno. While Amos F. Eno was abroad Henry Lane Eno had appealed to him for help saying that they had become so deeply involved that to carry the transaction through might necessitate the sale of everything else they had. From this experience Mr. Eno had lost confidence in the business ability and judgment of Henry Lane Eno. But for Amos R. Eno, the son of Henry Lane Eno, he created a trust fund of $1,500,000 and gave to him the old homestead. The reason for this will be considered later.

The General Society of Mechanics and Tradesmen had been given a legacy of $2,000,000 in his former wills. He decided, however, to make them a present gift of certain of his real estate, which he did by deed dated June 15, 1915, and also a cash gift of $25,000. He, therefore, formed the design of this change and the somewhat compensating present gift more than a month before the execution of the will, and executed the deed three days before the will was executed. He had,

therefore, borne this plan in his mind and carried it into final execution.  A copy of the will was to be forwarded to him at Saratoga.  It was delayed and he wrote Mr. Beers to forward it, but it arrived about the time he wrote for it.  He put it away in a red portfolio.  When Bigaut in July, 1915, was about to leave him to respond to the call of his class to the colors, Mr. Eno in an endeavor to dissuade him, told him to bring the red portfolio, took out the copy of the will and told Bigaut to read it, for the purpose of showing him that the $5,000 legacy in his favor was dependent on his continuance in the present employment until Mr. Eno's death (as indeed were the legacies to all of his other employees except Kohlsaat).  Bigaut spoke of the bequest to young Amos R. Eno and the leaving to him of the homestead; and Mr. Eno said he liked the boy, he appeared to be a very intelligent boy and he did not want the house to go into other hands. The fact that the boy bore the name of Amos R. Eno may also have influenced this decision.  When he received an acknowledgment of his gift from the General Society of Mechanics and Tradesmen, he spoke to Mrs. Desperrins, his housekeeper, concerning the legacy he had left to the society. Could a senile dement without sufficient capacity to make a will carry in his mind these items and give reasons for his bequests? In his business affairs he exercised the same active supervision and carried in mind details and wrote to his clerks definite and clear instructions.  When taxes were coming due he wrote for them to get tax bills on certain properties, telling them not to get bills on other specified properties because the tenants were to pay the taxes by the terms of their leases.  He wrote clear and concise instructions on many details and showed the same intelligent grasp of his business affairs as he had in former years.  He bought a small piece of property in Saratoga shortly before he returned to New York, at his own price, which was $1,000 less than the owner asked.  The contestants say that in transacting this business he was pursuing an accustomed routine which required no mental effort.  These letters, however, show not a mere traveling of an accustomed path, but the exercise of judgment in acting upon new questions and conditions; the consideration of the purchase and sale of property, making of leases and contracts for repairs,

close supervision of the receipt and disbursement of money, correcting errors of his clerks in entries in wrong accounts in his books and a constant knowledge of his bank account. He fully appreciated the events of the great conflict that was then raging in Europe, the possibility of our being drawn in, and the probable effect upon his investments. He talked of disposing of his real estate holdings even at a sacrifice. In computing the value of his estate he deducted a possible depreciation. During the last summer of his life he intelligently discussed with a military man the necessity for preparedness and universal military training, taking the pacific views of the President in opposition to those of his guest. In the course of the discussion the Monroe Doctrine was mentioned, and Mr. Eno gave an accurate account of its original promulgation and the reason of it and said that the strength of that doctrine rested on the American Navy. His correspondence with W. E. G. Fowler, his stockbroker, shows an appreciation of affairs relating to the financial world equal to that of the real estate business. It shows that he was well informed as to his investments and the effect which might be expected, which in fact resulted from certain interests getting control of one of the railroads in which he was interested. He comprehended the purport and effect of a decision of the United States Supreme Court in relation to the coal properties of the Delaware, Lackawanna and Western Railroad Company, of the stock of which he was a large holder. He refused to participate in the Anglo-French loan, saying he thought it was impossible for any one to tell how long the war would last and that its cost could not be determined. He feared the European nations would bankrupt themselves and he accurately predicted the subsequent violent rise and fall of the prices of stocks. We can see in his correspondence and these conversations in relation to business the keen observation and accurate appreciation of the bearing of events upon values, and the sound judgment in business transactions that had enabled him in seventeen years to increase his inheritance nearly four fold. His physician, although testifying in behalf of the contestants, admitted that Mr. Eno's health after his return from Jekyl Island and throughout the summer of 1915 was better than it had been for several years past.

Reviewing all the evidence and giving due weight to that produced by the contestants, in my opinion any inference that might be drawn therefrom adverse to the testator's capacity is overcome by the actual demonstration of his mental processes as shown by the documentary evidence. He undoubtedly had some weaknesses and infirmities, accentuations of some particularities, somewhat lessened care in his dress, and impairment of sight and hearing, yet he possessed to the day of his death a strong will, business capacity, discernment and judgment. If the question was to be determined by me alone I should have no hesitation in finding that Amos F. Eno was of sound and disposing mind and memory when he prepared and executed this propounded paper, and that it is entitled to probate as his last will and testament. The Legislature has provided, however, for a trial of the issue of testamentary capacity by a jury in the Surrogate's Court. We have recently held: " The well-settled rule in this class of cases is that if there be more than a mere scintilla of evidence tending to show incompetency to make a will and of such a character that different inferences may fairly be drawn therefrom the case must be decided as one of fact, and if the trial be before a jury it must be left to the jury." (*Matter of Barney,* 185 App. Div. 782, 794.) Until the Court of Appeals go farther than they have in repudiating the rule promulgated in *McDonald* v. *Metropolitan Street Railway Co.* (167 N. Y. 66; *cf. Matter of Case* 214 N. Y. 199, 204), we cannot dispose of this case, but must direct a resubmission of the issue to a jury, and hold that the verdict was contrary to the weight of the evidence. This court has all the powers in reviewing a decree of the Surrogate's Court based upon the findings of a jury that it has in an action at law (Code Civ. Proc. § 1317), but no more. The verdict in these proceedings is not advisory as in a suit in equity when issues are framed for trial by the jury. (*Matter of Barlow,* 180 App. Div. 860, 865.) The proceeding in the Surrogate's Court for trial of issues concerning the validity of a will was intended to take the place of an action in the Supreme Court under the former section 2653-a of the Code of Civil Procedure under which it was held that the determinations of questions of fact were the same as in any other case, where the issues were triable by a jury. (*Hagan* v. *Sone,* 174 N. Y.

317, 323; *Lesster* v. *Lesster*, 178 App. Div. 438, 450.) Therefore, the surrogate may direct a verdict (*Matter of Ruef*, 180 App. Div. 203; affd., 223 N. Y. 582), or if he denies that motion and on appeal it shall appear that he should have granted it, this court may reverse the decree, and direct that the will be admitted to probate (*Matter of Sweeney*, 178 App. Div. 780; affd., 222 N. Y. 658; *Matter of Dunn*, 184 App. Div. 386) under the same conditions as similar relief could be given in an action at law triable by a jury. We have not the power where the facts are determined by a jury that we have where the facts are determined by the surrogate, in which case we have all the power of the court of original jurisdiction to decide the questions of fact and to receive further testimony or documentary evidence. (Code Civ. Proc. § 2763.) For an interesting discussion of the origin and historical development of this power see opinion by Surrogate FOWLER (*Matter of Martin*, 80 Misc. Rep. 17).

As there will have to be a second trial it becomes necessary to consider certain of the rulings upon the admission of evidence, and exceptions taken to the charge.

Edith Eno, the wife of Henry Lane Eno, was allowed over the proponents' objection and exception to testify to a conversation at a luncheon in Amos F. Eno's house in which said Eno participated, and to testify to statements then made by Amos F. Eno. The objection made was that the witness was incompetent to testify to personal transactions with the deceased by reason of the inhibition of section 829 of the Code of Civil Procedure. Her husband, Henry Lane Eno, was a nephew and one of the heirs at law of Amos F. Eno. If the contestants were successful in this proceeding and the probate of the will refused, her husband would take, in case of intestacy or under the will offered for probate by the contestants, a very large interest in the testator's realty and she would have an inchoate dower interest in the land thus acquired. It is well settled that " an inchoate right of dower in lands is a subsisting and valuable interest." (*Simar* v. *Canaday*, 53 N. Y. 298, 304.) The witness had an interest in the event of the action, and by reason thereof was disqualified from testifying concerning personal transactions with the deceased. (*Steele* v. *Ward*, 30 Hun, 555; *Matter of Blaine*, 143 App. Div. 687, 690; *Roche* v.

*Nason*, 105 id. 256, 267; affd., 185 N. Y. 128.)   The learned surrogate at first sustained the objection to such questions. Later the witness was asked concerning a transaction without the question disclosing the presence of the testator; the counsel for the proponents inquired whether Mr. Eno was present, to which the witness answered yes.   Objection was thereupon made, but the surrogate overruled it on the ground that the counsel for the executors had by that question called for the testimony of the witness to a personal transaction with the deceased and, therefore, had opened the door, and ruled the witness competent to testify to " anything that you saw Amos F. Eno do, or heard him say on this particular occasion." This was clearly erroneous.   The question of proponents' counsel did not call for any personal transaction but merely for the fact of Mr. Eno's presence.   He merely asked sufficient to show that the evidence of the witness was incompetent for the purpose of making timely objections.   (*Greer* v. *Greer*, 58 Hun, 251, 254; *Davis* v. *Davis*, 86 id. 400, 403; *Hamlin* v. *Stevens*, 59 App. Div. 522, 524.)   The case of *Griswold* v. *Hart* (205 N. Y. 384) does not tend to support the ruling of the surrogate.   By the rule there laid down an interested witness is disqualified from testifying to a conversation or transaction in his presence, though it was not addressed to him and he did not participate in it, the court saying " whatever he derives from the personal presence of the deceased by the use of his senses is a communication from the deceased to him within the meaning of the statute."   In the instant case the question in form called for what the witness heard either Mr. or Mrs. Southack say on the occasion of the luncheon at Mr. Eno's house.   If Mr. Eno was not present the witness was competent to testify; if he was, she was not.   The fact of his presence or absence was necessary to be known in order that her competency might be tested.   The question to elicit this fact was for the purpose not of evading section 829, but of giving it effect.

The learned surrogate also committed prejudicial error in permitting questions to be put to proponents' witnesses Eugene Southack and W. G. Fowler on cross-examination with a view to impeaching them, and questions to impeaching witnesses, and proponents' objections were well taken.   He also

made prejudicial remarks in stating the grounds of his rulings in some instances. On his direct examination Southack testified to his personal relations, both business and social, with the testator. His direct testimony was strictly confined to a statement of conversations with the testator and to conduct he had observed, and to the identification of the written correspondence between them. He testified that what Mr. Eno said and did on those occasions impressed him as very rational. No questions were put to the witness, nor would they have been admissible, calling for his opinions on the merits, either in respect to Mr. Eno's general rationality, his general physical condition, his sanity, or his testamentary capacity; or whether the propounded paper was his real will, or what different disposition he believed the testator intended to make of his property. On cross-examination the witness was questioned in respect to former declarations expressing generally opinions on the testator's testamentary capacity, his sanity, his general health and his intentions to make a very different will from that propounded. These declarations were not related to any of the facts to which he had testified and to which his expressions of rationality had been limited, and were alleged to have been made after the death of the testator and prior to the trial, to Mr. Amos R. E. Pinchot, to Miss Constance Morgan, to Mr. Sumner Gerard, acting in behalf of Mr. Pinchot, and to Mr. Train, attorney for the contestant Henry Lane Eno. The witness having answered these questions in the negative, or by saying that he did not remember ever making the declaration, these persons except Mr. Train were called by the contestants to prove the declarations.

There are certain well-settled rules in respect to the preliminary questions that may be put to a witness to lay a foundation for contradicting testimony: 1. The contradictory declarations must be inconsistent with some material statement in his direct testimony. Otherwise, if the witness answers the questions the cross-examining party is bound by the answers as they are collateral matters, and not subject to contradiction. (*Kay* v. *Met. St. Ry. Co.*, 163 N. Y. 447, 450; *Furst* v. *Second Ave. R. R. Co.*, 72 id. 542, 545; *Carpenter* v. *Ward*, 30 id. 243, 249.)

2. The former declarations of a lay witness by proof of which he can be impeached must not only be relevant to the issue, but must be matter of fact and not* merely former opinions of the witness on the merits of the matters in controversy inconsistent with some different conclusion which the facts testified to by him may tend to establish. (*Holmes* v. *Anderson*, 18 Barb. 420, 422, cited in *Schell* v. *Plumb*, 55 N. Y. 592, 600.) A witness qualified to give an opinion who has testified to his opinion can be contradicted by proof of former inconsistent opinions. (*Patchin* v. *Astor Mutual Insurance Co.*, 13 N. Y. 268, 272; *McMahon* v. *Town of Salem*, 25 App. Div. 1, 4; *Matter of Oates*, 171 id. 679.) It may be, as the respondents strenuously argue, that the New York rule prohibiting a lay witness, who has had intimate relations with the deceased and, therefore, opportunities of observing his acts and conduct, from expressing an opinion generally on his sanity, is not in harmony with those of other jurisdictions, and has been the subject of criticism by Professor Wigmore. This discussion can have no relevancy to the questions under consideration, for whether Southack could have testified generally to Mr. Eno's sanity he was not asked to do so. It is not a very convincing argument for the admissibility of testimony that if he had been allowed to so express his opinion, contrary to the well-settled rules laid down by the Court of Appeals, then the questions propounded and the contradicting testimony would have been admissible.

Southack was asked on cross-examination: " Did you say to Mr. Pinchot, at the apartment upon the occasion of which we are speaking that you did not know whether his uncle was sane and fit to make a will or not, but that you would think it over and make up your mind, or in substance that? " Objection was made and overruled. The question was answered in the negative. When substantially the same question was asked of Mr. Pinchot an objection was made. In ruling on the objection the surrogate said: " I will allow the whole question because of the fact that the jury will draw from it their own inference whether or not Southack was making a bid to sell his testimony, that is the reason I let it in. It affects his credibility to that extent; " and during the argument on the objection the surrogate said: " I am not allowing this question

for the purpose of getting Southack's opinion as to the sanity of Mr. Eno, but only for the purpose for you to decide, why did Southack say that, what was he trying to do at the time? Was he seeing which side was going to get him as a witness?" And again in overruling the objection to Mr. Gerard's testimony in contradiction of Mr. Southack's denial of one of these clearly improper collateral declarations tending to show that Southack had expressed by equivocal answer a doubt as to Mr. Eno's sanity, the surrogate said: " The thing is does this contradict certain of Southack's testimony? Was he trying through Mr. Gerard to get next to something?" There was nothing in the testimony tending to show that Southack had made any attempt to bargain with any one with reference to giving testimony. He had not sought the contestants; they were pursuing him. Yet by innuendo in questions of counsel fortified by these remarks of the surrogate, a very distinct impression was given to the jury that the surrogate believed that he was endeavoring to negotiate with contestants to become a witness in their behalf.

Evidence to show corrupt endeavor by a witness to sell his testimony must be direct and positive and not rest merely on inference and suggestion of counsel and the court.

Mr. W. G. Fowler had known Mr. Eno for many years, both socially and in business, buying and selling securities for him. He had been Mr. Eno's guest at Saratoga for a week in September, 1915. He testified to conversations with Mr. Eno with reference to certain investments and produced correspondence between himself and Mr. Eno upon business matters during 1914 and 1915, and testified to Mr. Eno's appearance at his dinner table in Saratoga. He was not asked on direct examination about conversations at the dinner table in Saratoga. He testified to Mr. Eno's brusqueness of manner; he said " once or twice he told me to get out of the office." Mr. Fowler was not asked on direct examination whether Mr. Eno's conduct on these occasions impressed him as rational or irrational. On cross-examination, referring to the incidents of his being ordered out of the office, he was asked whether Mr. Eno's act impressed him as rational, and he said " perfectly so." He was then asked whether he had not said to Mr. Kohlsaat upon those occasions, " What is the

matter with the old man? Is he getting nutty?" Objection was made and overruled, and the witness answered that he could not remember such a conversation. He was asked also on cross-examination without objection whether Mr. Eno, at his dinner table when the witness was visiting him at Saratoga in September, 1915, in the presence of himself and Mrs. Fowler, had not used vulgar or indecent language, and he answered "not that I remember." He was then asked if he had not told Mr. Kohlsaat just what Mr. Eno had said concerning women at the dinner table in the presence of Mrs. Fowler, at Saratoga, and that it shocked Mrs. Fowler very much, so that she thought of leaving the table. The witness replied that he did not remember talking to Mr. Kohlsaat on that subject at all. The witness was then asked categorically if a few days before Mr. Eno's death he had not at Mr. Eno's office in New York said to Kohlsaat that the conversation of Mr. Eno at the table had been so coarse and vulgar that Mrs. Fowler was so mortified that she said to the witness that she wanted to get up and leave the table. Counsel then repeated the remarks Mr. Eno was alleged to have made and asked him whether he did not so state to Kohlsaat, to which the witness replied, "I have no recollection of such a thing." He was also asked, "Did you remark to Mr. Kohlsaat that Mr. Eno was going down hill very fast?" To which he answered, "I may have but I have no recollection."

Kohlsaat was allowed to state over objection and exception that Fowler had told him specifically each of the above-mentioned things. The questions asked Mr. Fowler as to these matters had not been brought out on direct examination, and the objection should have been sustained. The contestants were bound by the answers of the witness, and the impeaching testimony of Kohlsaat was improperly allowed.

Mr. Merz, a clerk in the office of Lord, Day & Lord, was sent to Mr. Eno's house after his death to make an inventory and to act as caretaker during the daytime. Mrs. Desperrins testified that Merz ordered a number of old letters to be burned. He testified that they were social letters, invitations, acknowledgments of gifts and other unimportant matters of that nature. Mrs. Desperrins testified that she had read all

First Department, April, 1921.            [Vol. 196

of these and that she from time to time had taken them from Mr. Eno's desk and made bundles of them and placed them in the bookcase where Merz had found them, and that there were letters from members of the family to Mr. Eno besides those Mr. Merz had testified to finding. There is no evidence otherwise as to what these papers were that were destroyed. Of those gathered by Merz and ordered to be destroyed, one-half or two-thirds were burned, and others were not, and lists of these were produced. Among them was nothing which bore upon any issue in the case. Merz stated that he did this on his own responsibility. Mr. Beers testified positively that he had given Merz no instructions to destroy anything. At the time the testimony of Mrs. Desperrins was given, undue influence was still an issue in the case and the surrogate stated that he admitted the evidence solely as bearing on that issue. Whether this evidence was properly received upon that issue is not necessary to be determined. For when the court decided to withdraw that issue from the jury he should have granted the proponents' motion to strike out this evidence.

The surrogate in denying the motion said: " I will not strike from the case under any condition the evidence as to the burning of the papers. They may have a bearing on the case beyond the question of undue influence. They may bear on the question of the credibility of the proponents' case." As the sole issue then to be submitted to the jury was the testamentary capacity of Mr. Eno it is difficult to see what bearing the destruction of old letters from members of his family, social invitations and other communications to the testator, by a clerk of an executor, after the testator's death, could have upon that issue.

The counsel for the contestants, although strictly limiting the proof when offered and throughout the trial to the issue of undue influence, on this appeal contends that it was admissible on either of two theories: (1) As affecting the credibility of Merz. (2) As evidence of spoliation of papers by a party to the suit. (1) Except in regard to the destruction of papers, Merz' testimony was limited to the factum of the will to which he was an attesting witness. The proof on this issue was not questioned and at the conclusion of the contestants' case the objection " that the said propounded

paper was never executed pursuant to the statute in such case made and provided, and it and its provisions are null and void " was dismissed and the question based on it was withdrawn from the jury. The credibility of the witness Merz, except in so far as it related to the issue of undue influence, which was later withdrawn from the jury, was not open to consideration. (2) It is well settled that the deliberate destruction of written evidence gives rise to the inference that the matter destroyed or mutilated is unfavorable to the spoliator. This unfavorable presumption will not dispense with the necessity of the other party introducing some other evidence of its contents, that it may appear that the documents destroyed were in fact relevant to the case. The presumption does not arise from the mere destruction of documents. It must appear that the documents were written evidence relevant to the issues, or at least the documents should by notice be required to be produced upon the trial. (*Fowler* v. *Martin*, 1 T. & C. 377; affd., 56 N. Y. 676.)

No such evidence was given, nor was any notice given or other demand made to produce any letter or paper, which was refused on the grounds of its destruction.

From all that does appear the papers written by others to the testator would have no relevancy or materiality on the sole issue submitted to the jury, the testamentary capacity of the testator at the time the will was executed.

In reply to the argument that the papers were not secretly destroyed, but that Merz had called in the housekeeper and in her presence had instructed a servant to destroy them, and that if there had been a fraudulent intent this would not have been done, the surrogate said: " Why does a murderer leave traces of his crime? " On denying the motion to strike out the evidence he said: " That may bear on the credibility of the proponents' case; " not on the credibility of witnesses or of their testimony, but " on the case." From the charge the jury might infer from this fact alone, irrespective of the other testimony, that they might find for the contestants. Eliminating the portion devoted to the reading of the will, extracts from statutes and decisions, the charge covered thirteen printed pages of the case on appeal, of which four were devoted to the incident of the burning of the papers. It would unduly

increase the length of the opinion to embody this portion of the charge. The burning was made the one outstanding feature of the case, strongly argumentative against the honesty and credibility of the proponents' case. It was highly prejudicial and permitted the jury to draw unwarranted inferences.

The surrogate in charging the jury as to the test of testamentary capacity read in substance an extract from the opinion in *Delafield* v. *Parish* (25 N. Y. 9, 29) as follows: "We have held that it is essential that the testator has sufficient capacity to comprehend perfectly the condition of his property, his relations to the persons who were, or should, or might have been the objects of his bounty, and the scope and bearing of the provisions of his will. He must, in the language of the cases, have sufficient active memory to collect in his mind, without prompting, the particulars or elements of the business to be transacted, and to hold them in his mind a sufficient length of time to perceive at least their obvious relations to each other, and be able to form some rational judgment in relation to them. A testator who has sufficient mental power to do these things is, within the meaning and intent of the Statute of Wills, a person of sound mind and memory, and is competent to dispose of his estate by will." We have heretofore stated that in this case the Court of Appeals was merely considering the sufficiency of evidence on the trial of an issue before the surrogate and was not laying down a rule for the instruction of jurors. (*Matter of Barney,* 185 App. Div. 782, 795.)

A judge or lawyer reading this extract would appreciate in the light of other decisions that "a capacity to comprehend perfectly" did not mean an ability, without reference to his books or a list of his investments, to remember with absolute accuracy each item and detail of his holdings, especially where his estate was of the value of many millions, and to recall without mistake the exact name of remote relatives, especially where by reason of marriage the surname had been changed. A jury composed of laymen might very properly infer from the word "perfectly" that it must be a comprehension without defect or lack of any kind, requiring no adventitious aids. Such a comprehension is not that required to constitute testamentary capacity. (See *Horn* v. *Pullman,*

72 N. Y. 269, 276; *Matter of Snelling,* 136 id. 515, 517; *Matter of Murphy,* 41 App. Div. 153, 156; *Ivison* v. *Ivison,* 80 id. 599, 603; *McGown* v. *Underhill,* 115 id. 638, 642; *Pettit* v. *Pettit,* 149 id. 485, 490.)   The decisions in this State seem to be in harmony with the rule as stated in Page on Wills (§ 97): " The real test of capacity has finally been agreed upon by the great weight of authority as follows:  the testator must have strength and clearness of mind and memory sufficient to know in general, without prompting, the nature and extent of the property of which he is about to dispose, the nature of the act which he is about to perform, and the names and identity of the persons who are the proper objects of his bounty, and his relation toward them."

In charging on the burden of proof as to testamentary capacity the surrogate read an extract from *Delafield* v. *Parish* (*supra,* 35):  " That the heirs of a deceased person can rest securely upon the statute of descents and distribution and that the rights thus secured to them can only be divested by those claiming under a will and in hostility to them, by showing that the will was executed by a testator possessing a sound and disposing mind and memory."  From this language a jury might gain the impression that the heirs had a vested or superior right to the property of a testator, of which hostile executors were attempting to deprive them, and think that it required more than a preponderance of evidence to justify the sustaining of a will.   There is no superiority as between heirs and legatees.   A man has a right to make such disposition of his property as he desires, and if he has testamentary capacity and is not swayed by fraud or undue influence, such disposition should be recognized and made effective.   Where a will is left the heirs have no rights to the property except such as are given by the will.   It is only where a man dies intestate, or where a paper is propounded for probate, and probate refused on the ground that it is not his will and testament, that the Statute of Descents and Distribution becomes effective.   Because the proponents come into court alleging that the paper propounded is the last will and testament of the deceased, the burden is cast upon them of proving due execution by, and the testamentary capacity of the testator. The burden of proof in will contests is governed by the rule

applicable to other cases; it rests upon the party who has the affirmative of the issue.  Jurors are too prone to consider that the will is submitted to their judgment as to the reasonableness of its provisions and to consider the claims of heirs superior to the expressed will of the testator and to decide the case upon their judgment of the reasonableness of the provisions rather than upon the capacity of the testator to declare and express his will.

It is, therefore, better to charge a jury upon the burden of proof in a contested will case in the same language usually employed when giving such instructions in other cases.  The reading of excerpts from judicial opinions in other cases is calculated to mislead rather than help the jury.  In an opinion by the Supreme Court of Pennsylvania it was well stated: " Judicial opinions are written to guide judges, not juries, and the judge who presides at the trial is expected to deduce the rules of law applicable to the case from all that has been recorded for his instruction, and to deliver them to the jury relieved, as much as possible, from the verbiage in which they are found clothed.  There is no standard but the discretion of the judge himself to determine how much help he shall render a jury in weighing facts, and applying the law to them. Perhaps the least amount of aid is rendered where the law is delivered in the form of copious extracts from judicial opinions in other cases." ` (*Hood* v. *Hood*, 25 Penn. St. 417, 422.)

The surrogate upon the trial found that as to the due execution of the will, and on the objection that the will was procured by undue influence, there were no contested questions of fact to be submitted to the jury.  We concur in that determination.  There was but one objection which he held raised a question for the consideration of the jury upon the evidence, that of the testamentary capacity.  We hold that the verdict on that question was contrary to the weight of the evidence, and under the authority of sections 2763 and 2538 of the Code of Civil Procedure we reverse the decree of the Surrogate's Court and the order denying the proponents' motion to set aside the verdict and for a new trial, with costs to all the parties who filed briefs in this court payable out of the estate, and order a new trial of this question:  At the time that said propounded paper was executed, was the said

Amos F. Eno of sound mind and memory and capable of making a valid disposition of his real and personal property.

CLARKE, P. J., and LAUGHLIN, J., concur; SMITH and MERRELL, JJ., dissent in part.

SMITH, J. (dissenting in part):

I concur in the opinion of Mr. Justice PAGE in the holding that the executors are entitled to a new trial on the ground that the verdict is against the weight of evidence. In the conclusion of the court, however, limiting the right of retrial to the issue of testamentary capacity, in my judgment, such limitation is unauthorized. Two issues were presented, *first*, the issue of undue influence, and, *second*, the issue of testamentary capacity. The court excluded from the consideration of the jury the question of undue influence. The contestants could not appeal from that ruling because they are not aggrieved by the judgment. The will was declared invalid. Nor could the contestants sustain this judgment upon any exception to this ruling unless the evidence so far preponderated in favor of the contestants upon the question of undue influence as to authorize the court to direct a verdict. The contestants, therefore, in my judgment have, upon a new trial, the right to litigate the question of undue influence, either upon the same or upon further evidence. (*City of Buffalo* v. *D., L. & W. R. R. Co.*, 176 N. Y. 308, 311.) I, therefore, dissent from such limitation.

Furthermore, I do not agree that the destruction of the letters by the clerk of the executors was not competent evidence. Its significance was perhaps magnified on the trial, but the relations between the decedent and his relatives were vital and material, both upon the question of undue influence and upon the question of the testator's competency. If the question of competency depends, as it clearly does, in part upon the appreciation of the moral claims upon his bounty of those who were in part excluded by the will, I cannot follow the reasoning which would hold that the destruction of any evidence which might bear upon that question was not a subject for the consideration of the jury, as an implied admission that if such evidence had not been destroyed, it might

admit of inferences adverse to the claims of the executors. To hold otherwise would permit an executor, who presumptively has an interest in sustaining a will, to destroy evidence which might be not only material, but perhaps conclusive of the issue. The effect of such an admission would be, of course, for the jury, subject to such explanation as might be made by the executors of the reason which prompted the burning of these letters. This clerk of the executors was an experienced clerk with large experience in the matter of estates. The burning of these letters was not inadvertent, but was deliberate. This will was executed shortly before the testator's death. It differed materially in the disposition of the property from that provided for by a former will made only about a year previous. The residuum was given to legatees for whom the testator had many times expressed positive aversion. While his change of purpose during the last year of his life would bear strongly upon the question of undue influence, it was also a proper subject for the consideration of the jury as to whether it was not indicative of a loss of that appreciation of the moral claims to his bounty which he had recognized in his prior will.

MERRELL, J., concurs.

Decree and order reversed, with costs to all parties who filed briefs in this court, payable out of the estate, and a retrial ordered upon the issue of testamentary capacity.