JEANNE E. HAGER, Individually and as Administratrix of the Estate of JOSEPH H. HAGER, III, Deceased, Respondent, v MOONEY AIRCRAFT, INC., et al., Defendants; AVCO CORP. et al., Appellants.

First Department, July 20, 1978

### APPEARANCES OF COUNSEL

*Thomas R. Newman* of counsel *(Siff & Newman, P. C.,* with him on the brief; *Mendes & Mount,* attorneys), for appellants.

*Daniel Donnelly* of counsel *(John R. Bartels, Jr.,* and *Irving Brand* with him on the brief), for respondent.

### OPINION OF THE COURT

LANE, J.

The decedent, Joseph Hager, was killed in an airplane crash

on December 2, 1969. He was flying in the airplane with his wife, Jeanne E. Hager, the aircraft being known as the Mooney Model M 20 E. One of the component parts of the engine of the M 20 E is a fuel-injection system known as Model RSA 5AD1. That fuel-injection system was designed and manufactured by the Bendix Corporation. The engine itself was manufactured by Avco-Lycoming Corporation. The M 20 E can best be described as a small, single-engine airplane which has two wing tanks. The fuel capacity of each tank is 26 usable gallons. Fuel is drawn from only one tank at a time. There is a lever on the floor adjacent to the pilot which when switched to the left draws on the left tank and when switched to the right draws on the right tank. The switching is mechanical in nature.

The accident occurred in the early evening of December 2, 1969, when Mr. Hager, while accompanied by his wife, began his flight from Mabin airport near Windham, New York, and was en route to Westchester County airport. After the M 20 E reached cruising altitude, the fuel-pressure gauge dropped and the airplane began to lose power. Hager made efforts to correct the condition, including switching on an electric booster pump and switching fuel tanks; however, the power was not restored and the plane ultimately crash-landed on Academy Street in Poughkeepsie, New York. After the plane landed on the roadway, it swerved, struck a tree, and a portion of the left wing was sheared off. This resulted in the immediate death of Mr. Hager and caused Mrs. Hager to sustain serious physical injuries. The right fuel tank remained intact and was found to contain approximately 13 gallons of fuel. The left fuel tank was ruptured.

Jeanne Hager brought this lawsuit both individually and as administratrix of the estate of her husband, Joseph Hager, against Avco Corp. and Bendix Corp.[1]

The sole theory upon which liability was sought to be imposed upon the defendants Avco and Bendix was that there was a defect in the screen in the fuel injector which was

---

1. Initially there were six named defendants: Mooney Aircraft, Inc., Aerostar Aircraft Corp. of Texas, Butler Aviation International, Inc., Gulf Oil Corp., Avco Corp., and Bendix Corp. The action against Mooney Aircraft which had been previously severed was dismissed by the court on consent of the plaintiff. Stipulations of discontinuance were filed with the court with regard to all other named defendants except Avco Corp. and Bendix Corp. Ultimately all of the cross claims asserted both by Avco and Bendix were dismissed.

incorporated in the Avco engine. This defect allegedly caused clogging of the strainer, resulting in a loss of fuel to the engine, which in turn resulted in the airplane crash.

This case was tried by a court without a jury, and the court made findings of fact and conclusions of law which included a finding that there was fuel in the left tank at the time of the crash which spilled out when the left tank was ruptured; that the proximate cause of power failure and resultant crash was a blockage by unknown contaminants of the fuel-injector screen in the Bendix RSA 5AD1 fuel injector, which prevented a sufficient flow of fuel to the engine to enable the M 20 E to maintain altitude; that the fuel-injector screen was defective in that it did not insure adequate continuous fuel flow at all times; that neither Mr. nor Mrs. Hager, by exercising reasonable care, would have discovered the defects in this engine and realized the danger; and that neither Mr. nor Mrs. Hager was contributorily negligent.

■ Our review of all of the evidence leads us to the ineluctable conclusion that the proximate cause of the power failure and the resultant crash were not due to any blockage in the Bendix fuel injector. Our analysis of the evidence will be divided into three parts: The first part will weigh the evidence adduced as to whether or not there was usable fuel in the left tank at the time of the crash. The second part will be concerned with the presence of contaminants either in the fuel tanks or in the fuel which could possibly clog the screen. The third part, assuming the presence of contaminants, will explore whether the screen was capable of being clogged to such a degree that there would be a total power loss, as occurred in the case at bar.

PART I

*Fuel Left in the Tank at the Scene of the Accident*

Several people testified that they were at the scene of the crash very shortly after it occurred. Mr. Fred B. Kacena, employed by the Federal Aviation Administration, observed that the left fuel tank had been ruptured, that the fuel-selector valve was on the left-tank position, and that fuel was being siphoned out of the right tank, which siphoning was done by a Mr. Dennison, who operated a shop at an airport nearby.

Another person at the scene of the accident was Stuart

Carlin, who, upon reaching the scene, smelled the odor of gasoline, which Carlin conceded, however, could have arisen because the engine had been severed from the airplane and the fuel lines had ruptured as a result of the accident. The fuel present in the fuel lines could have "back-flowed" on the ground, which would cause an odor of gasoline. Furthermore, he conceded that every tank of gasoline in an airplane contains a small quantity of "unusable fuel"; that is, fuel at the bottom of the tank which collects in a strainer which cannot reach the engine but which nonetheless remains at the bottom of the gas tank, and he said that the odor could have been caused by the flowing of that small amount of unusable fuel.

Charles Maggiacomo, who operates an automobile "speed shop" and had also been a pilot since 1962, testified that, upon arriving at the scene of the crash, he immediately began to examine for gas leaking in the area in order to determine whether or not there was any danger of an explosion. Maggiacomo was quite familiar with the odor of gasoline and with the odor of burning gasoline because his business dealt with racing cars. He could distinguish between the spilling of a whole gallon on the ground in an area, as opposed to spilling of a small amount. He also stated that he examined underneath the tanks and dug into the ground to see if there had been any absorption of moisture and found that there was none. This evidence could lead to the conclusion that the left tank was empty prior to its rupture. However, this was not the only evidence adduced which could lead one to the conclusion that there was no gasoline remaining in the left tank at the time of the crash.

Further evidence was adduced indicating that the only gasoline sold to Captain Hager within the immediate days prior to the accident was on November 17, when 48.3 gallons were pumped into the gas tanks by Garry Henry, an employee of Westair, located at Westchester County airport.

Philip O'Brien, Jr., who had been in the Air Force after graduating from West Point in 1949 and who had flown both jet and regular engines, and who also acted as a maintenance officer on flight tests, retraced the traveling of the Hager airplane from the time of refueling when it then had a full 52 gallons until the time of the crash, and, based on his calculations of average fuel used and additional fuel used on takeoffs, found that there would have been approximately 13 gallons left at the point of impact. The rate of fuel consumption could

not be determined with pinpoint accuracy because, on takeoff, additional fuel is used to generate needed additional power and furthermore, on cruising speed, the pilot can adjust the mixture of the fuel with air intake to make either a lean or rich mixture (the richer the mixture the more fuel used per hour, of course). In addition, the flight taken by Hager was retraced with another Mooney aircraft which was piloted by Andrew Thom. During that trip Thom used 43.3 gallons of fuel for the exact same flight. Of course, Thom conceded that he was running a richer-than-usual mixture when he took this flight because he had a new engine requiring a higher fuel mixture. This richer mixture could account for the difference between the use of 39 gallons by Captain Hager versus the 43.3 gallons used on the simulated re-created trip.

All of this testimony in the aggregate, however, leads convincingly to the conclusion that the left tank was bereft of usable fuel at the time that the airplane crashed.

PART II

*Contaminants in the Fuel*

There were 13 gallons remaining in the right fuel tank after the crash in this case, which were taken for analysis and found to contain 1.5 mg of contaminants per gallon.[2] Minimum Federal standards for aviation fuel require that no more than 6 mg per gallon of contaminants be found in aviation fuel. Expert testimony revealed that this level of contaminants meant that fresh fuel was in the tanks and would not have led to clogging of the fuel-injector screen.

Plaintiff during the course of the trial made much of a notation in the Bendix Maintenance Manual which stated: "Numerous reports of gradual fuel pressure loss have been traced to this finger strainer [located in the Bendix fuel injector] becoming plugged with dirt and a varnish-like substance that is almost invisible to the naked eye." The overwhelming weight of authority in the expert testimony at trial indicated that varnish-like substances do not appear in 100-octane aviation fuel. Furthermore, one of the experts, Kenneth Kohlof, of Industrial Testing Laboratories, located in New York City, tried to create a varnish-like substance in 100-

2. The M 20 E used 100-octane aviation fuel.

octane aviation fuel and could not do it.[3] All of the experts testified that in order to create a varnish-like substance one would need as ingredients either stale fuel, or aromatic products in the fuel, and very high temperatures (that is, exceeding 400°F.). Further testimony showed that the aviation fuel in an M 20 E aircraft would not reach a temperature of over 150 degrees F.; 100-octane aviation fuel also does not contain aromatic material.

Testimony of William Mulokey revealed that stale gasoline had a distinctive odor similar to varnish and could cause deterioration of synthetic rubber parts which, in turn, could cause gummy deposits. In the case at bar, however, the fuel was concededly fresh and was shown to be free of any other contaminants. There was also testimony that it would be unusual for contaminants such as rubber or pieces of hair to get into an aircraft fuel tank, even when it was being refueled. It would appear, therefore, that neither staleness nor the possibility of contaminants being present in the fuel was a fact to be considered in determining this case.

PART III

*The Fuel Injector Screen*

The fuel injector has affixed to it a screen called Dutch twill weave, which consists of two screens adjacent to each other. The screens are meshed in such a way that no hole goes directly through the screen and a particle starting on the inside of the screen cannot move directly to the outside but has to "find its way" in a tortuous fashion. The screen used was 74 microns. Seventy microns is described as .0027th of an inch, or the equivalent of the diameter of one human hair. That means that a 74-micron screen would have openings ever so slightly larger than one human hair. The actual screen which was in the fuel injector involved in the crash was tested and found to be free of contaminants. The test which was made was called a "flow test", which was done at the Lycoming plant in Williamsport, Pennsylvania, in the presence and supervision of a representative of the FAA and a representative from the National Transportation Safety Board. Pressure was placed on the screen to simulate normal airflow, and

3. The test was conducted by placing 100-octane fuel under 100 pounds of pressure and then placing that into boiling water for 72 hours. After removal of the pressure and cooling of the fuel, no gum or varnish was found.

there was no showing that the screen had been blocked or plugged. Furthermore, testimony of William Thayer, the mechanic who serviced the Hager plane, indicated that the fuel-injector screen in this engine had been cleaned 54 hours prior to the accident at a normal cleaning operation, which involved soaking the screen in a solvent and then blowing it clean with a pressure gun. Contrary to the testimony of plaintiff's expert, Henry Powers, this is the method that is used to clean all aircraft strainers. William Thayer, the airframe and power-plant mechanic who actually cleaned the screen involved, testified that the method he used was utilized in cleaning screens when he worked for American Airlines; when he worked on jet fighters for Republic Aviation; and when he worked for Sadler Aviation at Danbury airport. James Champion, a mechanical engineer, who was the joint holder of a patent on the Continental fuel-injection system, also testified that the use of a solvent and air blowing was a proper screen-cleaning method.[4]

Enzo Mentana, a department head at the Henry Abbott Technical School in Danbury, Connecticut, also testified that an accepted method of cleaning was the one used by Thayer.

A mere visual observation of the screen would be inadequate to show any contaminants in the screen itself; however, the screen of Hager's aircraft was not only flow-tested but was microscopically examined and found not to contain any contaminants. None of the experts who testified found that there was any history of either a varnish-like substance or any other substance clogging the fuel-injector strainer. No reported accidents were introduced as resulting from a clogged fuel-injector strainer. There was one instance of clogged strainers shown; however, it did not involve a varnish-like substance and the fuel injector had a 40-micron screen, which is a much finer screen than the 74-micron screen in the M 20 E. Furthermore, the problem involved a plane other than an M 20 E. The reason, however, for the clogging of the injector in that engine was clearly explained and related to the fact that the fuel tanks in that particular airplane were manufactured by molding rubber around the cardboard mold and then reaching in and ripping out the interior cardboard. Not all of the cardboard could be ripped out, and during the course of this process hair or particles of lint from the sleeves of the

---

4. Continental and Bendix manufactured 99% of all domestically used aircraft fuel-injection systems.

person removing the cardboard would invariably remain inside the tank. When the tank was filled with fuel, the fuel would carry these contaminants to the filter and the filter would then become clogged. When the screen was changed to 74-micron size, that clogging did not occur. Furthermore, there was no evidence adduced at this trial that there were any contaminants in the fuel or in the fuel tanks which could result in the type of clogging which occurred in that prior instance, and the aircraft was manufactured by a company other than Mooney.

The statement in the Bendix manual about "numerous" incidents involving varnish-like substances clogging fuel-injector strainers was traced back to an early 1958 manual which was drafted by an individual who consistently used the phrase "numerous instances" as a cautionary device but not because there was documentary proof thereof. That cautionary language was carried forward through inadvertence to the newer manual. In further testimony, it was elicited that even if the fuel strainer were more than 99% clogged there would still be sufficient fuel capable of going through the strainer so that the airplane engine would not stall, and there would be sufficient power to maintain altitude in the airplane. The evidence adduced at trial showed that there was no imminent need to incorporate a bypass in fuel-control systems. The knowledge regarding incorporation of bypasses in engines was no secret in the aviation industry and was known as early as the 1940s. Yet plaintiff's own expert, Henry Powers, testified that the engine fuel-control systems of which he was aware contained no bypass provisions on their fuel controls. The reason for not incorporating such bypasses is readily explained. Though there was no bypass in the fuel-injector screen, its safety factor and "survival engineering" lay in the fact that it could be almost totally clogged and would still operate adequately.

James Champion, who, as mentioned previously, was joint patent-holder on the Continental fuel injector, testified in this regard as follows:

"Q Sir, based on your own experience in the design of Continental fuel strainers and based on your familiarity with the state of the art and the engineering principles which pertain thereto and based on your examination of the Bendix finger strainer and based on hearing Dr. Fitch's testing of the filtration or catch capacity of that particular weave, in your

opinion, did the Bendix fuel injection strainer which you hold in your hand meet the generally accepted engineering principles and/or state of the art design principles which were in existence in approximately 1960?

"A In my opinion, yes, it meets it, apparently, for their filtration size requirements for structural integrity and certainly for capacity, when you consider the testimony of how much of it could be clogged before it restricted flow. The margin of safety is tremendous.

"Q Well, now, assume that Mr. Ware, himself, said it was even at 99.96 percent clogged you could still develop 34 percent power, does this indicate to you that there is a safety margin present in that particular design?

"A Yes, in my opinion, is a great safety margin if you have this much area and it can still function down to the percentage of clogging that we have heard under the testimony.

"Q Sir, further to the safety margin, together with the 3.6 square inches of area, coupled with the recommendation of the manufacturer to clean it every fifty hours, does the recommended periodic maintenance also contribute to the high safety factor of the Bendix finger strainer?

"A Yes, it would."

Similarly, Ernest Fitch, a professor of mechanical engineering at Oklahoma State University, commented about the safety of the one-piece screen by stating:

"Well, I would have to conclude from my tests that this filter is—does not need a bypass valve to protect it because I doubt if you could even plug it in as long as you have the airplane. I think it will keep sloughing the particles off and recycling itself.

"If you just take a chance and just take it off and with a little bit of care, I think it's all it would require.

"Now, I base this upon the curve of the plugging characteristic curse [sic] because this curve because this curve [sic] is showing that it would still provide adequate flow for that engine when it's 99.—well, even—what was it, Mr Ware said?

"Q 99.96.

"A 99.96 plugged, using his own figures.

"This is in the hundreds and hundreds, may be a thousand hours it would take to plug it that much.

"Now, that is, safetywise, if there is—supposed to clean an

element every hundred hours when they go in for mainte-
nance and if you provide sump, that will give it maybe five to
ten times that as a safety factor in hours. I don't know what
else could be done.

"And I think it would be much better to do that than to
even provide a—some kind of a moving parts bypass which is
in his—well known to leak. A bypass valve is normally going
to leak particles passed. And it can contaminate the down-
stream side. And the trend in many systems today and a
trend that Pall Corporation is promoting is ful, *[sic]* flow
filters, no bypass, no nothing."

Finally, Simon Ross, who was at one time employed by the
Federal Aviation Administration as chief of the power-plant
section, testified that during his work with that agency he
personally granted certification to over 40 engines incorporat-
ing the one-piece Bendix strainer between the years 1965-
1969. That certification meant that the model approved was
satisfactory to the Government.

In sum, the expert testimony indicates that the fuel-injector
strainer was not clogged and that the left fuel tank was empty
at the time of the crash. The coincidental confluence of an
empty left fuel tank and the simultaneous clogging of the fuel-
injector screen were found by the Judge and conceded by
counsel for the plaintiff to be highly improbable. It would
appear that the clogging of the fuel-injector screen was not
the proximate cause of the crash. Furthermore, there was no
convincing proof adduced that the design of the screen was
defective because of the flow through the screen being "in-out"
versus "out-in." It was claimed by the plaintiff that the "in-
out" flow pattern of the screen allowed contaminants to be
trapped in the interior of the screen where they would remain
invisible and unnoticed until a clogging occurred. However,
other experts involved in filter-screen design (James Cham-
pion and James Kirwin) noted that the choice of "in-out" flow
versus "out-in" flow is dependent upon the space allotted in
the aircraft frame for the engine and both patterns are
equally safe. Furthermore, any contaminants collecting in the
screen would be purged at the 50-hour inspection of the
aircraft. If a blockage, as hypothesized by plaintiff's experts,
existed at the time of takeoff from Mabin airport, the fuel-
pressure gauge would not have reflected ability of the plane to
take off, since at takeoff time more power is required.

A few additional observations regarding the expert testi-

mony are in order. The testimony of Joseph Ware, characterized in the dissent as a "highly qualified expert," was refuted in significant aspects. Ware had indicated that the symptoms of fuel-pressure loss described by Mrs. Hager were inconsistent with a possible fuel blockage upstream of the fuel-injector system. The latter-type blockage, Ware testified, would cause the pressure needle to fluctuate rather than stabilize. Tests performed by Paul Gunberg, holder of a master's degree in civil engineering and an employee of the Bendix Corporation, revealed that a restriction in the fuel line upstream of the pump would not cause any significant variation on the pressure needle. Ware's description of the symptomatology of the engine's stopping completely was refuted by the sound films placed in evidence and described in the testimony at trial, and his description of the drop in pressure due to fuel-injector blockage was refuted by Ernest Fitch, professor of engineering at Oklahoma State University and director of the Fluid Power Research Center. The validity of the testimony of Henry Powers can also be readily called into question since he admitted that he "never worked on any fuel controls on any engines, as far as design work."

The credence of Powers as an expert regarding the fuel-injector screen was effectively nullified in the analysis of his testimony by James Champion, the joint patent-holder of the Continental fuel-injector system. Powers had opined that the only bypass system available in general aviation aircraft was to be found in the Continental fuel injector. Champion, who designed that injector, categorically denied the existence of such a bypass.

In sum, the record before us does not reveal a "parade of industry witnesses" whose testimony is "weak" and should be deemed incredible but, rather, it is the testimony of plaintiff's experts which is sharply called into question and which presents significant roadblocks, as illustrated, preventing a finding in favor of the plaintiff.

The dissent makes much of the destruction of documentary evidence by Bendix and Avco. William Bruns, an employee of Bendix, described that after reports were received and acted upon they were destroyed. The succinctly stated reason was that once a problem was pinpointed and cured no purpose was served by retaining the records. This does not mean that the plaintiff was deprived of documentary materials. It must be emphasized that the FAA records were available. Further-

more, introduced into evidence were the Mooney Aircraft Company reports from 1960 to 1970 reflecting reports regarding malfunctions or defects.

Our review of the testimony of Mrs. Hager regarding her observations immediately prior to the crash, and its comparison with the re-creation of the flight, further reinforce our conclusion that the cause of the accident was not a clogging of, or a defect in, the fuel-injector screen incorporated in the Lycoming engine used in the M 20 E aircraft. Mrs. Hager testified that she did not observe her husband while he made the "walk-around" of the aircraft prior to takeoff. She did not see him unscrew the gas-tank caps to check the fuel level. She could not testify from which tank the plane was drawing fuel at the start of this last flight. Mrs. Hager, in her own testimony, admitted that she could not have known by looking at the fuel indicators how much fuel was left in the tank. On cross-examination the following question and answer were elicited:

"Q And did you state on direct examination, Mrs. Hager, that your husband told you that you must not rely on your fuel quantity gauges in the aircraft?

"A Yes, sir. That's true."

She further testified that, after the plane had reached its cruising altitude, her attention was drawn to the fuel-pressure gauge and she noticed at that time that it was dropping steadily and gradually. She noticed her husband was then working with the fuel-booster pump and the fuel-mixture control, and reaching between the two seats to the tank-switching mechanism. However, Mrs. Hager could not see whether her husband was actually switching it because of the relatively cramped space and the fact that her vision was blocked during such maneuver by her husband's shoulder. Assuming, as the dissent does, that the plane was being fueled from the right tank and that then Mr. Hager switched to the left tank, we need not reach the conclusion that the fuel-injection screen was clogged. There was evidence introduced offering an equally plausible explanation; namely, a restriction occurring in the fuel lines prior to the fuel reaching the injector system.

Simulation of this last portion of the flight prior to crash, utilizing an M 20 E aircraft with the left tank nearly empty, resulted in the fuel-pressure gauge flickering and then steadily dropping. A throttle adjustment and switching to the right

tank could start the engine again. It was hypothesized that Hager, in the excitement of the moment, may have switched the selector to the right tank and then not have left the fuel selector in that position long enough for the engine to catch. Furthermore, the throttle may not have been in the correct position for restarting the engine.

The test flights which were made, in which the left fuel tank was allowed to dry out and become empty, showed that the plane was capable of gliding for a period of between five and eight minutes without engine power, which would have been sufficient time (theoretically) to glide down from approximately the point where the engine stalled to the nearest airport. The expert testimony adduced on behalf of the plaintiff regarding the last moments of flight was undermined totally by detailed testimony of the defense witnesses; for example, one of the plaintiff's experts said that if there were a loss of fuel and gliding for five minutes there would be no noise. This was contradicted by other experts and by a sound film simulating the occurrence. The re-creation of the moments before the accident effectively mimicked the description given by Mrs. Hager, who survived the crash. Any discrepancies could be attributable to Mrs. Hager's being preoccupied at that time (e.g., with trying for two or three minutes to ascertain the frequency of the radio tower at the nearest airport).

The plaintiff clearly has failed to sustain her burden of casting either Avco or Bendix in liability in this case. The evidence with regard to the fuel leads overwhelmingly to the conclusion that there was no usable fuel in the left tank when the M 20 E struck the ground, contrary to the finding of fact made by the trial court. Furthermore, there is no showing that there was a design defect in the Bendix injector screen, that the screen was clogged, or that its malfunction was the proximate cause of the accident. The court, reaching that conclusion, was engaging in speculation, which is not a substitute for proof when one seeks to attribute blame for an unexplained accident (Kelly v Otis Elevator Co., 283 App Div 363, 367, affd 308 NY 805). When the plaintiff has not met the burden of proof, the action must fail (Schwartz v Macrose Lbr. & Trim Co., 29 AD2d 781, affd 24 NY2d 856). Here there are equally plausible explanations for the occurrence; namely, that there was a clog in the fuel line, or that the pilot did not allow enough time for the engine to restart on the right tank,

and that there was no fuel in the left tank. In such a situation, one cannot make a selective application of one of the explanations and claim that that is sufficient to cast a defendant in liability *(Friedman v Medtronic, Inc.,* 42 AD2d 185, 187).

In our analysis, we have kept in mind that our primary function in reviewing a record on appeal is not to test the credibility of witnesses, since that is best left to the trier of the facts who heard the live testimony *(Amend v Hurley,* 293 NY 587, 594; *Kelly v Watson Elevator Co.,* 309 NY 49, 51). Our determination should rather rest upon whether plaintiff has met the burden of proving her case by a fair preponderance of the evidence. In a nonjury case, this court may grant the judgment which, upon the evidence, should have been granted by the trial court *(De Mayo v Yates Realty Corp.,* 35 AD2d 700, 701, affd 28 NY2d 894), after having given appropriate weight to the credible evidence adduced *(Spano v Perini Corp.,* 25 NY2d 11, 19).

In the case at bar, the speculations of the plaintiff's experts cannot be said to outweigh the specific and scientific tests introduced into evidence by the defendants. In order for the plaintiff to prevail, she must prove her claim: that the proximate cause of the accident was a clogging of the fuel-injector screen. We find that plaintiff has not met this burden. In making this determination, we note that the *Noseworthy* rule is not applicable to the case at bar. The rule in essence is that "in a death case a plaintiff is not held to as high a degree of proof of the cause of action as where an injured plaintiff can himself describe the occurrence" (citations omitted) *(Noseworthy v City of New York,* 298 NY 76, 80). The rule therefore is applied when there are no eyewitnesses to the occurrence, and the participant is incapable of testifying either because he is dead *(Noseworthy v City of New York, supra)* or amnesiac *(Schechter v Klanfer,* 28 NY2d 228; *Wartels v County Asphalt,* 29 NY2d 372, 380). In the case at bar, Mrs. Hager, a participant in the occurrence, did testify. Her description of the physical situation and the actions taken by her husband were quite detailed, including her observations of gauges in the cockpit, the procedures prior to the crash-landing, and the course of action her husband took from the inception of the occurrence. In these circumstances, the *Noseworthy* rule loses its significance both with regard to Mrs.

Hager's individual claim as well as in the wrongful-death action.

■ Even if we were to consider the evidence through the lesser degree of proof required by the *Noseworthy* rule, it would appear that plaintiff has not even met that lesser burden. Viewing the evidence adduced in the light most favorable to the plaintiff, there is, therefore, but one conclusion that can be reached; namely, that the complaint against the defendants must be dismissed. Accordingly, the judgment of the Supreme Court, New York County (FRAIMAN, J.), entered March 1, 1977, in favor of the plaintiff, should be reversed, on the law and the facts, and the complaint dismissed, without costs.

LUPIANO, J. (dissenting). "[I]n a wrongful death action, the burden of proof on the issue of a decedent's contributory negligence is placed on the defendant, and the plaintiff is not held to as high a degree of proof in a wrongful death action as he would be in an action where the injured party is available as a witness in his own behalf" (67 NY Jur, Wrongful Death, § 235). "Provided it is not shown that decedent was guilty of contributory negligence, the plaintiff in a wrongful death action may prevail where the inference of a defendant's negligence is more probable or more reasonable than the inference of his nonnegligence * * * The plaintiff is entitled to go to the jury if there is any possible hypothesis on the evidence negating fault of the decedent and permitting an imputation of negligence to the defendant" (67 NY Jur, Wrongful Death, § 248). As aptly noted in *Swensson v New York, Albany Desp. Co.* (309 NY 497, 502): "we must determine whether plaintiffs' evidence presented facts and circumstances from which [defendant's] negligence, and the cause of the accident by that negligence, may be reasonably inferred *(Betzag v. Gulf Oil Corp.,* 298 N.Y. 358, 365), *but plaintiffs were not required to offer evidence which positively excluded every other possible cause of the accident (Rosenberg v. Schwartz,* 260 N.Y. 162, 166)" (emphasis supplied). The Court of Appeals has also succinctly observed that in determining whether plaintiffs have made out a prima facie case "we have been guided by the rule that the facts adduced at the trial are to be considered in the aspect most favorable to plaintiffs and that plaintiffs are entitled to the benefit of every favorable inference which can reasonably be drawn from those facts *(De Wald v. Seidenberg,* 297 N.Y. 335, 336-337; *Osipoff v. City of*

*New York,* 286 N.Y. 422, 425; *Faber v. City of New York,* 213 N.Y. 411, 414)" *(Sagorsky v Malyon,* 307 NY 584, 586). The scope of the inquiry by the Court of Appeals, in that court's own words, is as follows: "Is there evidence—direct or circumstantial—from which the negligence of the defendant and the causation of the accident by that negligence may be reasonably inferred?" *(Betzag v Gulf Oil Corp.,* 298 NY 358, 362.)

Three issues are presented: (1) whether plaintiff sustained her burden of establishing that the cause of the crash was clogging of the screen in the fuel injector aboard the aircraft, (2) whether plaintiff proved by a fair preponderance of the credible evidence that the failure to incorporate a bypass in the injector screen constituted defective design, and (3) whether the award of $1,200,000 is excessive.

In the early evening of December 2, 1969, a single-engine airplane crashed on Academy Street in Poughkeepsie, New York. Aboard the aircraft were its pilot, Joseph H. Hager, III, and his wife, Jeanne E. Hager. Captain Hager died in the crash; his wife was seriously injured. The aircraft in which they were flying was a Mooney Model 20E. Its engine was a Lycoming 10-360-AIA which had been manufactured by defendant Avco Corp. A component of that engine was a Bendix RSA-5AD1 fuel injector which had been manufactured by defendant Bendix Corp. Joseph H. Hager, III, was an experienced airline pilot by profession, a captain for American Airlines, flying 727 jet aircraft. At the time of his death, he had piloted aircraft in excess of 5,000 hours. He had piloted the Mooney Model 20E approximately 500 hours. The day of the crash, the Hagers arrived at the White Plains airport for their flight to Mabin airport. Captain Hager performed his usual walkaround preflight inspection, and Mrs. Hager observed the fuel quantity indicators for the left and right fuel tanks. From experience with the operation of the fuel indicators, Mrs. Hager, although not a pilot, knew that both tanks were full. It was Captain Hager's custom to use the fuel in the right tank first. The 40-minute flight from White Plains to Mabin airport was uneventful.

Toward dusk, the Hagers returned to Mabin airport for the return flight home. Captain Hager conducted his customary preflight walkaround inspection. The left tank continued to show full and the right tank indicator registered between one-half to three-quarters full. After climbing for approximately 10 minutes to cruising altitude and after some 6 to 10 minutes

at that altitude, Captain Hager announced that the fuel pressure was dropping. Mrs. Hager during the following critical time sequence observed the fuel pressure gauge indicate a gradual and steady dropping, with no fluctuation in the needle. Captain Hager activated the fuel boost pump and instructed his wife to shine a flashlight on the right wing fuel tank area. She did so, and observed no concaving of the wing in that area. Her husband then reached down in the same manner as he had done on prior occasions when switching from one fuel tank to another. Mrs. Hager noticed that the engine seemed to be losing power and observed the fuel pressure gauge continue to drop to almost 5 psi (pounds per square inch) at which point it held steady. The engine began sputtering. Captain Hager then attempted a forced landing, in the course of which the plane impacted against a large tree.

The left fuel tank was ruptured by the impact and the ground beneath it was darkly stained. According to at least two qualified observers who were among the first to arrive at the scene, there was a strong odor of gasoline. Thirteen gallons of fuel remained in the right wing tank which had not ruptured. The tank in each wing had a 26-gallon capacity. Consequently, it was unequivocally demonstrated that the right tank was one-half full at the time of the crash and that on the basis of Mrs. Hager's testimony as to the fact that both tanks were full at the inception of the round-trip flight, then some fuel from the right tank was of necessity consumed during the flight. The only evidence at trial (offered by defendants) as to when the plane was last refueled indicated that it was refueled on November 17, 1969 with 48.3 gallons.[1] Assuming defendants' witness Colonel O'Brien to be correct in his assertion that, based upon the tachometer reading taken from Captain Hager's diary at the time of the November 17 refueling and the tachometer reading at the time of the accident set forth in the NTSB report showed an intervening engine time of 4.96 hours which, based upon Hager's average fuel consumption resulted in a fuel consumption of 39 or 40 gallons,

1. There is some indication on the record that the plane might have been refueled subsequent to November 17, 1969. However, plaintiff was unable to unequivocally demonstrate such refueling other than her observations of the fuel tanks indicators at the inception of the round-trip flight on December 2, 1969 and her husband's ambiguous statement to her on November 18, 1969 in connection with his dissatisfaction at the service received at Westair that "he was going to check and see if [the] airplane had been refueled and if they don't want to give us gas there that he could get his gas at other places."

and assuming the plane was not subsequently refueled, then it is clear that Captain Hager during the course of his flight must have utilized fuel from both tanks. It would be physically impossible to have utilized only one tank in the flight from White Plains to Mabin and the return flight until the time of the crash. Mrs. Hager testified that she did not know what tank her husband was using on the flight from White Plains to Mabin airport, but that he usually used the right tank first. There was no testimony of an utterance of Captain Hager or of an unobstructed view of the position of the fuel tank selector switch which would unequivocally demonstrate which fuel tank was used at the commencement of the flight or return flight, or the sequence utilized by Captain Hager in switching from one tank to the other. However, there is one strong piece of circumstantial evidence tending to show that at the time the plane began to experience difficulty, Captain Hager was utilizing the right tank. The critical testimony of Mrs. Hager is as follows:

"A [My husband] said there was a drop in fuel pressure. I looked at the fuel pressure gauge and it was just below the green. My husband said he was going to put the boost pump on * * *

"Q Do you recall your husband flipping the fuel boost boost pump switch?

"A Yes, sir.

"Q At that time, did he tell you as he manipulated various controls, did he tell you what he was doing as he proceeded to do various things?

"A No. He just said he would put the boost pump on. *He then told me to look at the right wing.* I got a flashlight out of the glove compartment and I shined it on * * * the right wing * * * I shined it out on the right wing and the right wing looked fine to me. There wasn't any indentation as there had been that one other time * * *

"Q You referred to 'that other time.' Could you explain in greater detail what occurred on that other time, to do with the indenting of the wing? Could you describe that incident, if you would?

"A He had just said that there is something wrong. He told me to look out at the right wing and see if there was any indentation in the wing * * *

"The Court: Did you subsequently learn after that incident

why your husband asked you to look at the wing and what you were looking for?

"The Witness: Yes. When we landed—at that time he also reached down between his legs, between his leg and my leg—at that time the engine continued to fly all right. And when we got down on the ground *he checked the air vent on the right wing.* And subsequently found out that there was mud material from a mud wasp nest that had been made up into the vent that had *blocked the air vent into the right gas tank.*

"Q Is that the air vent into the tank that equalizes the pressure as the gasoline flows out of the tank, if you know?

"A It's under the wing and it's a little vent * * *

"Q On that occasion when you looked out at the wing, did you see a buckling of the wing?

"A Yes. It was indented. You could see that the skin was sunken in.

"Q Wasn't that the top of the wing which is, actually the top of the fuel tank that was buckling? Isn't that what that was?

"A Yes, sir" (emphasis supplied).

Common sense dictates that there is strong circumstantial evidence that at the time the plane experienced difficulty in that the fuel pressure began dropping, Captain Hager was utilizing the right fuel tank and was concerned with the condition of the right wing which might give some indication for the loss of fuel pressure respecting the fuel being pumped from the right wing tank to the engine. Mrs. Hager observing no indentation on the right wing, Captain Hager reached down between their legs in the same manner as he had done on prior occasions when he had switched from one fuel tank to another. If he was utilizing the right fuel tank, this switching would result in the indicator now being switched to the left tank. This was the last indication perceived by Mrs. Hager of a switching of fuel tanks prior to the crash. It is admitted that after the crash the fuel tank switching indicator showed that it was set to the left tank. Faced with a steady loss of fuel pressure from the right tank which it is admitted was half full, Captain Hager, a professional pilot with much experience, would attempt to exhaust every recourse to land his stricken craft. Switching to the left tank was a reasonable expedient, even if we assume he knew that he had utilized most, if not all, of its fuel theretofore in the round-trip flight.

It is beyond peradventure that the crash was not due to fuel exhaustion. Even assuming that the majority are correct in their finding contrary to that of the trial court in this nonjury case that the left tank was bereft of usable fuel, such finding does not weaken plaintiff's case. As it appears that Captain Hager was utilizing the right fuel tank at the inception of the steady loss of fuel pressure and as such tank was clearly half full, the loss of pressure indicates a blockage in the system designed to funnel fuel from the right tank to the engine. The absence of buckling in the right wing would indicate that there was not a repetition of the air vent clogging in the right wing.

Fuel flowing from the tanks to the engine passed through a very coarse screen at the tank's outlet to the fuel line and then through a 150-micron screen located inside the fuel selector valve. At this point, contaminants or foreign particles smaller than 150 microns and some with one dimension greater than 150 microns could pass through. From this point the fuel flowed to the electric boost pump to the engine driven pump and then to the fuel injector. Fuel flowing into the injector had to first pass through a 74-micron injector screen which was contained in the injector and lay horizontally across the front of the aircraft. The 74-micron screen was much finer than either of the two screens located upstream of it in the fuel system and was woven into a twin double-Dutch weave. Because of this weave, unlike the other two screens, any foreign particle in the fuel could not flow directly through the screen, but had to make its way through a labyrinth. This weave accordingly enhanced the contaminant catching ability of the screen. No bypass feature was incorporated into the screen of this aircraft.

Testimony at trial, at examination before trial and other evidence discloses that Bendix first introduced the RSA-5ADI fuel injector in 1961 without testing to determine the effect of partial blockage on its ability to maintain adequate fuel flow. The original 60-micron screen utilized in the injector system was discontinued after three months and a 40-micron screen substituted. However, clogging, occasioned by use of the latter, forced retrofitting in 1962 of all aircraft theretofore using the 40-micron screen with the 74-micron screen. In 1963, Bendix introduced a three-piece screen which incorporated a bypass feature which assured uninterrupted fuel flow when any clogging of the screen occurred. This bypass screen was inter-

changeable with the 74-micron screen without the bypass feature and, as early as 1963, could have been installed in all Bendix RSA-5ADI injectors from that time forward without redesigning the injector to incorporate the screen. When this bypass was first introduced, it was not incorporated into all RSA-5ADI injectors thereafter produced, even though it was known and could be anticipated that without the bypass feature, if the screen became clogged, the fuel flow would be interrupted.

Captain Hager's fuel injector was built on August 4, 1964, some 14 months after the bypass screen had been introduced. It did not have a bypass feature. In 1968, a year prior to this crash, the manufacture of the nonbypass screen was discontinued.

The Bendix RSA-5 Operation and Service Manual issued on March 1, 1965 states in pertinent part: "Satisfactory operation of the fuel injection system depends on the fuel being relatively free of contamination. To fulfill this requirement, a 74 micron strainer is incorporated in the injector. Numerous reports of *gradual fuel pressure loss* have been traced to this finger strainer becoming plugged with dirt and a varnish-like substance that is almost invisible to the naked eye." (Emphasis supplied.) This admission relates to the use of the 74-micron screen. Manuals theretofore issued in 1961 and 1963, when the 40- and 60-micron screens were respectively used do not contain similar language. Testimony elicited from defendants' witness Fitch discloses that a pressure drop of only .72 psi which would be barely noticeable on the fuel pressure gauge could well indicate a 99.08% blockage or clogging of the screen. Relating this to the manual, it might well be concluded that the problem Bendix was alluding to in its manual ("gradual fuel pressure loss") betokened the burden of total power loss due to the screen being clogged. In subsequent RSA-5 Operation and Service Manuals issued on November 1, 1968 and April 15, 1972, the acknowledgment of "[n]umerous reports of gradual fuel pressure loss" was reiterated. William Bruns, supervisor of defendant Bendix's service engineers, testified that the fuel complaint of clogging occurred in 1963 and that he knew of reports of this problem as late as 1967 and 1968. Although he did not know the actual number of reports of clogging, he testified that it was less than 100. Plaintiff's inability to prove specific episodes of the clogging problem is attributable to the *destruction by defendants* Avco

Corp. and Bendix Corp. of the very records through which plaintiff could have proved such instances. Indeed, it was admitted that although plaintiff in Item 24 of her request for production of documents which were served on February 12, 1974 called for all notifications submitted by defendant Avco Corp. to the Federal Aviation Administration of any failures, defects or malfunctions of the fuel injector system and all documents relating to such failures, defects or malfunctions, such records were not destroyed until the end of 1972. Where it appears that evidence in fact relevant to the issues has been destroyed "[i]t is well settled that the deliberate destruction of [such] evidence gives rise to the inference that the matter destroyed or mutilated is unfavorable to the spoliator" *(Matter of Eno,* 196 App Div 131, 163).

Despite being deprived of documentary sources through which to establish instances of screen blockage, plaintiff demonstrated a specific instance involving another plane of engine failure after 45 minutes of flight due to clogging of an injector screen admitted by defendant Bendix Corp.'s supervisor of service engineers to be "almost identical" to the screen used by Captain Hager. In that instance the aircraft would have crashed had it not had a second engine. Mr. Kirwin, a Bendix employee, testified to two specific instances of clogging of 60-micron screens which had 10% less contaminant catching ability than the 74-micron screen. In both those instances there was a gradual fuel inlet pressure loss. Rust in the tanks plugging up the screen was the culprit in one situation and the other was diagnosed as a partially plugged screen.

The trial court by virtue of its findings of fact and conclusions of law apparently placed little stock in the testimony of the defendants' parade of industry witnesses through whom defendant attempted to establish that a hazardous problem of screen clogging never existed. Critical admissions of certain key witnesses produced by defendants as to instances of screen clogging, the repeated statement of the problem in the Bendix RSA-5 Operations and Service Manuals and the acknowledgment by defendants' witnesses O'Brien and Fote, both of whom were called to establish the nonexistence of the problem based upon certain records (including Malfunction and Defect Reports, Service Difficulties Reports, and Field Reports) that those records were incomplete, clearly justify the trial court's findings as to the cause of the power failure.

Obviously the greater contaminant catching ability of the

74-micron screen with its improved filtration increased the prospect of clogging of the screen. Its inside-to-outside flow design could well result in contaminants being trapped in the interior of the screen with consequent accumulation. By virtue of its design, visual inspection of the screen was not conducive to a determination of whether it was clean. This was testified to by defendants' witnesses O'Brien and Thayer and plaintiff's witness Powers. Plaintiff's expert Powers also testified that, from a design point of view, the procedure for cleaning a 74-micron twilled double-Dutch weave screen was an ultrasonic bath followed by backflushing, yet no such procedure was recommended in the Bendix or Avco manuals. Indeed, both Thayer and Fitch, testifying for the defense, conceded that after cleaning the screen they could only assume it was clean, but had no way of knowing that it was, in fact, clean. As already noted, a pilot would have no advance warning that a critical blockage was about to occur because there was virtually no fuel pressure drop with the screen already 99.08% clogged. The foregoing factors, viewed in context with the declaration in the Bendix Manuals that there had been occurrences of loss of fuel pressure due to clogging of the screen formed the basis for the opinion of plaintiff's expert Powers that failure to incorporate a bypass feature into the 74-micron screen rendered its design defective. Patently, the screen was not subject by virtue of its design to adequate visual inspection or facile effective cleaning.

In this connection it may be noted that other critical elements of design were imbued with what may be termed survival engineering. There were, for example, two alternate air sources (air being necessary for combustion), a dual ignition system, two fuel tanks and two fuel pumps. Witnesses produced by defendant Avco Corp. (Light and Carle) in effect conceded that, given the information in the Bendix RSA-5 Operation and Service Manuals, the absence of a bypass feature constituted defective engineering. Indeed, Simon Ross, the FAA employee who had initially signed letters under which the RSA-5ADI injector had received its certification, conceded that the subject screen required a bypass and did not meet the applicable minimum FAA standards without it.

Defendants rely on the testing performed by their expert Fitch to support the thesis that the injector screen was not defectively designed. Fitch introduced 1.5 mg of contaminant per gallon of fuel as representative of what had been in

Captain Hager's aircraft. He conceded that his test results demonstrating no clogging of the screen would be invalid if the quantity of contaminants per gallon which he utilized in his testing was incorrect. Defendant's expert Kohlhof, who had analyzed a sample of fuel obtained from the Hager aircraft, determined that the sample contained 1.5 mg of contaminant per gallon. However, he admitted that he knew nothing about the handling of the sample he had tested from the time the fuel had been removed from the aircraft on Academy Street on December 2, 1969 until he received it, 10 days later, on December 12. Further, he did not know how many containers the fuel had been in prior to the time he had received it, nor did he know how long the fuel had occupied any given container before he received it. The following critical testimony was elicited from this witness:

"Q Now, I'm satisfied that the analysis which you made was accurate as to the sample which you received. My question is, do you have any way of knowing whether the sample which you received is a true representation of what was in the tank at the aircraft at the time it crashed?

"A No, I have no way of knowing.

"Q Isn't it true that solid particulates would have a tendency to fall down, to settle out?

"A Yes.

"Q And if a five gallon can or something like that had been used to drain a portion of the fuel out of the tank of that aircraft and that five gallon can had sat for a period of time and the sample which you had received was poured off the top of that tank, that the sample which you received would not have accurately represented what was in that tank?

"A If it had been poured off the top, it would not be an accurate representation."

Defendants' expert Fitch candidly acknowledged that if the 1.5 mg figure he utilized in his testing had no foundation in fact, his projected service life of the screen was incorrect. Relevant to the issue of testing the screen with gasoline containing contaminants is the assertion by plaintiff's expert Powers that he did not test flow contaminants to see how much could be put in to prevent clogging of the screen because it is very difficult to determine what is an average rate of contaminants in a particular fuel flow—"I would not know what degree of dirt I could get between the refinery and

the final nozzle going into this tank, nor do I know the degree of dirt inside of this aircraft itself. It's very difficult to set up a test of that nature."

The trial court found that "[t]he cause of the power failure and resultant crash was a blockage by unknown contaminants of the fuel injector screen in the Bendix RSA 5ADI fuel injector, preventing a sufficient flow of fuel to the engine to enable the M 20E to maintain altitude." Plaintiff advanced proof at trial that such blockage was the *only* causal event consistent with Mrs. Hager's observations after her husband had directed her attention to the initial fuel pressure loss. Support for this conclusion was advanced by the critical testimony of plaintiff's highly qualified expert Joseph F. Ware, Jr. He testified to extensive testing of various components of the fuel flow system respecting blockage, to wit, *inter alia,* blockage of the injector screen, blockage of the fuel selector valve, clogging upstream of the engine driven pump. These tests supported the conclusion that the sole cause of the pressure and power loss observed by Mrs. Hager during the time period recounted by her was a progressive blockage of the injector screen. Visual inspection of the screen to determine if it was clogged was conceded to be inadequate to determine if the screen was clean. The flow testing of the screen at Lycoming after the accident which demonstrated that the screen was capable of flowing fuel was not dispositive. This capability could be demonstrated even with the screen 99.4% blocked. Only a minimal amount of contaminants, to wit, .56% of contaminants, would have had to become dislodged from the screen during and/or after the crash to achieve the flowbench capability alluded to by defense witnesses.[2] Such dislodgment and migration could easily have occurred as a result of the impact forces to which the engine and plane were subjected during the crash and the engine coming to rest upside down, with the result that, when the fuel line to the injector screen was disconnected, at least some of the contaminants were lost. The following critical testimony was elicited from plaintiff's expert Ware:

"The Court: * * * [H]ow is it consistent that the screen

2. Plaintiff's expert Ware testified as follows: "Q What quantum of clear area of the screen would have to be cleared of contaminants to enable an aircraft which had the screen blocked to the extent of 99.96 percent of blockage to enable that same screen to be flowed on a flow bench and flow 119 pounds of fuel per hour? A The difference would be in terms of blockage of the screen, 99.96 compared with 99.4".

functioned perfectly normal with your testimony that in your opinion the crash was caused by a screen that was completely blocked?

"The Witness: The answer is that between the time of the crash and the time of the fuel bench test, fuel flow bench test, a very, very small amount of particles could have dropped out of the screen * * *

"The Court: You don't know that it did?

"The Witness: No. But I believe we have some additional analysis which we can show just exactly what we think did happen here * * *

"Q I believe you testified with reference to some contaminants may have dropped off the screen. What is the basis of your belief that that may have happened?

"A My basis is that you first have to go through a kind of time history of the events, starting with the case where the airplane is in flight, there is pressure inside of this screen, and that pressure is holding any particles up against the screen on the inside, because that pressure is there from the engine driven pump. Now after the airplane crashed the engine was subjected to some very high acceleration forces and was wrenched, along with the nose of the airplane, from the fuselage and it landed some 10 feet or so away from the fuselage, upside down. Now the engine was upside down and tilted in this manner shown on this picture. Remembering Mr. Ross' testimony about the fuel line from the injection unit to the fuel pump on the engine, that line essentially goes horizontally, over to the injector and then slightly down like this.

"When the engine is upside down then that line is down from the injector unit. If the particles were released, again I am talking about some very, very small particles, the difference between 99.4 and 99.96, those particles were released when the engine is upside down and the line from the injector is downward sloping toward the pump, those particles could migrate downward."

Defendants attack this critical testimony as speculation and urge that even if the theory was valid, the dislodged contaminants would have been trapped inside the strainer and discovered after the flowbench test. However, this argument overlooks the fact that defense witness Harbaugh, who conducted the flowbench testing, admitted that the screen had never been removed from the injector nor examined. It is apt at this

point to reiterate the telling admission by Thayer, the mechanic who serviced the Hager plane, that he did not know whether the screen was clean at all after his effort to clean same some 54 hours prior to the accident. Thayer's cleaning provides little basis for the argument that in 54 hours the screen could not have critically clogged inasmuch as the degree of clogging at the inception of that period is unknown.

To summarize: There was no showing that the malfunction of the plane and its subsequent forced landing were due to pilot error or to fuel exhaustion, and a strong circumstantial case was made by plaintiff to the effect that the accident was caused by a clogged fuel injector screen which was defectively designed.

Relevant to fuel exhaustion, as noted above, assuming the left tank was bereft of usable fuel at the time of the crash does not noticeably improve the defendants' position. Further, there is countervailing circumstantial evidence advanced by plaintiff to the effect that the left tank was not empty of usable fuel at the time of the crash. First, there were Mrs. Hager's observations in reading the fuel gauge indicators at the inception of the round-trip flight showing both tanks to be full or nearly so. After the plane crashed there was the added observation of Horace Hopps, a former captain in the Poughkeepsie Fire Department and Stuart Carlin, a pilot, as to the presence of gasoline emanating from the ruptured left fuel tank. These witnesses were immediately on the scene and their statements based on observed facts indicated a quantity of gasoline fully signifying that the left tank was not bereft of all usable fuel at the time of the crash. The trial court sitting as trier of the facts was entitled to credit this testimony provided it was not unreasonable.

It is recognized that "[w]here * * * the subject matter is of such a technical nature that the proper conclusion to be drawn from the facts depends upon professional or scientific knowledge or skill, qualified experts may express their opinions as to the proper inference to be drawn from a given set of facts, as an aid to the jury in reaching their own conclusion in the case before them" (Richardson, Evidence [10th ed], § 367). "Inasmuch as there is involved here a cause of action for wrongful death, the plaintiff is not held to as high a degree of proof as in a case where the injured plaintiff could himself describe the occurrence. (See *Noseworthy v. City of New York,* 298 N.Y. 76; *Andersen v. Bee Line,* 1 N Y 2d 169; *Wragge v.*

*Lizza Asphalt Constr. Co.,* 17 N Y 2d 313; *Cruz v. Long Is. R.R. Co.,* 28 A D 2d 282; *James v. Holder,* 34 A D 2d 632.)" *(Cady v City of New York,* 35 AD2d 202, 203.) Both plaintiff and defendants have offered expert testimony as to the causation of the accident herein. This evidence (expert testimony) including the entire evidence presented by this record set forth a question of fact as to the cause of the accident which was properly presented to the finder of fact (see *Sarfati v Hittner & Sons,* 35 AD2d 1004, affd 30 NY2d 613). Where the conclusion is a matter of scientific, skilled or professional knowledge, an expert may testify to the conclusion as well as the proposition upon which it is based (see Fisch, New York Evidence [2d ed], § 413). Whether a witness' testimony, be the witness an expert or lay person, is to be accepted as true is normally a question for the jury to decide. Beyond cavil, the testimony of plaintiff and in a crucial sense, that of her expert, Ware, is not incredible as a matter of law, is not improbable, suspicious or in conflict with the evidence or the inferences flowing therefrom. In light of the weaknesses respecting the testing and conclusions based thereon advanced by defendants' witnesses as delineated above, the relative strength of plaintiff's case becomes more apparent. The trial court was clearly justified in finding on this record that plaintiff's proffered explanation of the cause of the crash fitted *all* the known facts as observed and testified to. Defendants are able to advance their fuel exhaustion theory only by a select aggregate from among the objectively observed facts testified to at trial. This is emphatically not a situation where there is an equally plausible explanation for the occurrence given the testimony and evidence presented. Of course, both defendants' theory—fuel exhaustion and plaintiff's hypothesis—a clogged 74-micron fuel injector screen may be deemed reasonable, albeit plaintiff's contention comports more favorably with all the known facts and observations. It is well in a case like this to remember the famous dictum of Judge O'BRIEN in *Boyd v Boyd* (252 NY 422, 429): "In a case so close as this, let the court of first instance decide. Face to face with living witnesses the original trier of the facts holds a position of advantage from which appellate judges are excluded. In doubtful cases the exercise of his power of observation often proves the most accurate method of ascertaining the truth." The trial court in reaching its conclusion was not engaging in speculation as is charged by the majority but was relying on the testimony of plaintiff and her experts. There is no basis in law

on this record for overturning the trial court's conclusions or the findings upon which they were based.

The majority cleverly point out that Mrs. Hager's testimony is based on limited observations of her husband, Captain Hager's actions on the day of the crash and that these limitations of necessity must be taken into consideration in weighing her evidence. Obviously, only Captain Hager, if he survived the accident and was competent to do so, could testify from knowledge as to what tank he was using and when and to the innumerable other precautions and actions to be taken in proper maintenance and operation of his single-engine private airplane. Thus solace is obtained for the majority's conclusion from the fact that Mrs. Hager's testimony is limited to her own observations and experience. She can, for example, only testify that it was her husband's practice to use the right tank first, not that she knew he was using the right tank. She can only testify that at the critical juncture after her husband asked her to examine the right wing and her response that visual inspection with a flashlight showed no buckling on the wing, her husband bent down to where the fuel valve selector is located. Of course, she cannot testify that he actually switched tanks as her view of the selector itself was impeded. Having criticized Mrs. Hager's lack of knowledge respecting critical matters relevant to the accident, which knowledge could be supplied only by Captain Hager, the majority now opt to change the rules of the game by opining that Mrs. Hager is not entitled to the benefit of the *Noseworthy* doctrine. They state, in effect, that Mrs. Hager's testimony, albeit believable, is insufficient to make out a prima facie case because Captain Hager only had knowledge of these critical elements and that despite the death of Captain Hager, Mrs. Hager is not in consequence entitled to the lesser degree of proof. This unfair attack on Mrs. Hager's testimony is further compounded by the majority's assumption that since Mrs. Hager is here, that is, she survived the accident and testified at trial, not only does *Noseworthy* not apply, but Mrs. Hager's testimony is not to be believed. In essence, the majority apply two different standards of proof to Mrs. Hager's testimony and this procedure is not countenanced by reason, common sense or case law.

One other final observation is made. The majority opine that "[i]n the case at bar, the speculations of the plaintiff's experts cannot be said to outweigh the specific and scientific tests introduced into evidence by the defendants." With equal

fervor, based on analysis of the trial transcript under recognized tenets of appellate review, the dissent declares that in the case at bar, the speculations of the defendants' experts cannot be said to outweigh the specific and scientific tests introduced into evidence by the plaintiff (i.e., her experts).

Study of the record discloses that the award in the death action is excessive and should be reduced from $1,200,000 to $950,000. Such award more adequately reflects, on this record, "fair and just compensation for the pecuniary injuries resulting from the decedent's death", and the other items set forth in EPTL 5-4.3.

Accordingly, in my view, the judgment, except insofar as it is in favor of the plaintiff, as administratrix of the estate of Joseph H. Hager, III, deceased, should be affirmed, without costs and disbursements, and insofar as it is in favor of the plaintiff as administratrix, the judgment should be modified, on the law, to the extent of reducing the verdict in favor of the plaintiff as administratrix from $1,200,000 to $950,000, and, as so modified, affirmed without costs and disbursements.

FEIN, J. (dissenting). I concur in the dissenting opinion of Justice LUPIANO. However, I would add the following.

The majority opinion carefully dissects the proof to conclude that plaintiff failed to sustain her burden of proof on the issue of liability. It concludes that the findings of the trial court were highly speculative and finds that "an equally plausible explanation for the occurrence" was the failure of the pilot to allow enough time for the engine to restart on the right tank and the absence of any fuel in the left tank. Such speculation as to the cause of the crash without the benefit of having observed the manner and demeanor of witnesses who appeared to testify is unwarranted.

Moreover, the evidence dispels the conclusion that the cause of the crash was fuel exhaustion. The majority completely discredits the unrefuted testimony of Mrs. Hager, which affirmatively establishes the existence of a mechanical defect as the proximate cause of the crash. Her testimony and the other facts found to exist refute the suggestion that the crash and the death of Mr. Hager resulted from fuel exhaustion. Also overlooked is the fact that Mr. Hager was an experienced commercial pilot, with in excess of 5,000 pilot hours at the time of the crash and with 500 hours' flight time in the Mooney aircraft at the time of the accident. The majority

disposition in effect requires a preliminary finding that this experienced pilot reacted in an unorthodox manner in the face of an emergency by not allowing sufficient time for the engine to restart on the right tank while, at the same time, heroically landing his aircraft on a city street in Poughkeepsie. The record does not support such inconsistency. Rather, it is sufficient to support the findings of the trial court that the principal cause of the death was a critical blockage in the fuel injector screen, not any negligence or misfeasance of the pilot. This also accords with the concession by both parties upon argument of this appeal that the cause of the crash was either fuel exhaustion or a blockage of fuel in the fuel injector screen.

The majority inappropriately substitutes its judgment for that of the trial court. An appellate court, however, should not disturb a decision rendered following trial upon a question of fact where a finding is made on the basis of conflicting evidence or upon evidence from which conflicting inferences may be drawn, unless the finding is clearly erroneous and cannot be said to be affirmatively supported by the evidence (see *Waddle v Cabana,* 220 NY 18, 24; 10 Carmody-Wait 2d, NY Prac, § 70:385). Here, it is clear that there was a rational basis for the determination rendered by the Trial Justice. The trial court evidently found Mrs. Hager to be a credible witness. There is insufficient reason shown for us to reject her testimony merely because of her obvious interest in the outcome of the case. Nor is there any apparent merit to defendants' unsubstantiated charge that the testimony of Mrs. Hager should be rejected since "plaintiff was at liberty to say whatever she, her counsel and expert witnesses considered most helpful for her case." There is no warrant for such allegations in the face of the explicit and careful findings by the trial court to the contrary.

The testimony of Mrs. Hager, the sole survivor of the crash, stands unrefuted. Although she was not a pilot, she had flown approximately 100 hours with her husband in the Mooney aircraft. Before departing Westchester County airport, she observed that the fuel quantity indicators indicated that the left tank was full and that the right tank was three-quarters full. When the couple prepared to leave Mabin on the return to Westchester County, Mrs. Hager did not accompany her husband in the preflight walkaround inspection. However, there is no proof in the record to warrant a finding as

suggested by the majority that Mr. Hager did not follow his normal procedure of conducting such walkaround inspection prior to commencement of the flight. According to Mrs. Hager, at that time, the fuel gauge for the left tank showed full and the indicator for the right tank indicated between one-half and three-quarters of a tank. Taking into account Mrs. Hager's testimony that her husband's usual procedure was to fly on the right tank before switching to the left, and giving due consideration to her testimony as to the position of the fuel indicator before departing Mabin, there is a rational basis for the finding that at the time the aircraft departed on its return leg to Westchester County airport, Mr. Hager was flying on the right tank. After Mrs. Hager observed the fuel pressure gauge gradually decrease from 14 psi to 5 psi, Mr. Hager activated the fuel boost pump. He thereafter requested that his wife shine a flashlight on the right wing in the area of the fuel tank to check for concaving of the right wing. This also indicates that at the time the trouble developed Mr. Hager was flying on the right tank, which was found intact with 13 gallons of fuel after the crash. After checking the right wing and finding no curvature, Mrs. Hager observed her husband reach down between his right leg and her left leg to where the fuel selector valve was located. Although she did not actually observe him switch from one valve position to the other since his shoulder blocked her vision, she had observed him on prior occasions perform the same maneuver in order to switch fuel tanks.

Mrs. Hager's description of the drop in fuel pressure from 14 psi to 5 psi as occurring gradually over a period of three to four minutes further supports the conclusion that there was a blockage in the fuel injection system and serves to discredit fuel exhaustion as a possible cause of the crash. Tests performed affirmatively establish that fuel exhaustion will result in total loss of fuel pressure within a period of from 8 to 30 seconds.

Of particular significance is the fact that Bendix, who manufactured the fuel injector system, knew for some time that there was a potential for critical blockage of fuel in the fuel injector screen. The majority opinion unnecessarily downplays the warning contained in the Bendix RSA-5 Operation and Service Manual, issued March 1, 1965, which acknowledges: "Satisfactory operation of the fuel injection system depends on the fuel being relatively free of contamination. To

fulfill this requirement, a 74 micron strainer is incorporated in the injector. Numerous reports of gradual fuel pressure loss have been traced to this finger strainer becoming plugged with dirt and a varnish-like substance that is almost invisible to the naked eye."

This warning was repeated in subsequent service manuals issued on November 1, 1968 and again on April 15, 1972. Publication of such a warning over an extended seven-year period bolsters the admission by Bendix of a fuel pressure problem traced to a blockage in the fuel injector screen. It also dispels the majority's suggestion that this warning was originally included in the manual by an overcautious employee and was carried through and repeated in subsequent manuals through inadvertence. To accord any validity to the majority suggestion would unnecessarily minimize the purpose and function of such service manuals issued by an aircraft component manufacturer. To assume that a manufacturer would inadvertently or improperly include in the manual a warning as to a potential danger when no real problem exists defies credulity. To the contrary, William Bruns, supervisor of Bendix' service engineers, testified that the company had received reports of a clogging problem in the fuel injector screen. Although Bruns did not know the actual number of reports which had been received, he stated that it was less than 100, but that the defect and trouble reports relating to such problem had been destroyed. Taking into consideration the destruction of such records and reports, the trial court was warranted in drawing the strongest inferences against defendant Bendix which the opposing evidence would permit *(Milio v Railway Motor Trucking Co.,* 257 App Div 640; *Borman v Phipps Estates,* 260 App Div 657; *Noce v Kaufman,* 2 NY2d 347, 353).

Of further significance is the fact that in 1968, more than one year prior to the crash, Bendix discontinued manufacture of the nonbypass screen of the type which had been installed in the Hager aircraft and converted to future use of a bypass screen. Bendix did not, however, advise aircraft users that it was now manufacturing a bypass screen which could be incorporated into the existing fuel injector system. The duty of the manufacturer to advise users as to the existence of a newly developed device which could be incorporated to avoid or reduce a known risk inherent in the existing system is a further factor to be considered, particularly if one gives defer-

ence as one should to the warning repeated by the manufacturer in its service manual during the four-year period subsequent to the introduction of the bypass feature. In this connection, plaintiff's expert was of the opinion that the failure to incorporate a bypass feature in the fuel injector screen did constitute a defect in design.

There was, therefore, a rational basis for the finding by the Trial Justice that the Bendix fuel injector screen was defective in not assuring adequate and continuous fuel flow. The testimony of Mrs. Hager and the other evidence in the case further support and furnish a rational basis for the trial court's conclusion that the defective screen was a substantial factor in causing the accident and the death of Mr. Hager. A reasonable view of the evidence supports the conclusion that at the time the problem developed Mr. Hager was flying on the right tank, which was found to contain 13 gallons of fuel following the crash. Once this finding is made, it is irrelevant whether or not there was usable fuel in the left tank at the time of the accident.

Although I would affirm the trial court's disposition as to the liability issues in the case, I conclude from my review of the evidence that the sum awarded as damages for the wrongful death of the decedent was excessive. Defendants challenge as excessive the award for the wrongful death of Mr. Hager ($1,200,000), suggesting that their research has failed to disclose a case in this State where an award of more than $500,000 in a death action has been sustained on appeal. The size of the verdict, however, is not dispositive. Rather, the propriety of any verdict is wholly dependent upon the facts involved in each case, arrived at by computing the pecuniary loss to the survivors. Nor is it at all relevant to argue, as defendants do, that a proper award would be a sum which if properly invested, would furnish the survivors with a sufficient rate of return somewhat parallel to decedent's annual earnings. Such an actuarial approach has never been accepted in this State. Nor does it conform to the statutory measure of recovery to provide "fair and just compensation for pecuniary injuries resulting from the decedent's death to the persons for whose benefit the action is brought" (EPTL 5-4.3).

Decedent was a pilot for American Airlines, flying 727 jet aircraft. He had been promoted to Captain on March 24, 1967, and was 35 years of age at the time of his death. He had a life expectancy of 36.5 years and a work expectancy of 24.7 years. Mrs. Hager, who was 38 years of age, had a life expectancy of

33.2 years. The Hagers had four children, ages 10, 9, 7 and 5. Decedent's Federal income tax returns for the years 1965 through 1969 revealed earnings of $15,675 in 1965; $19,169 in 1966; $24,822 in 1967; $29,252 in 1968 and $28,387 for the 11-month period prior to his death in 1969. Raymond Boylan, an American Airlines manager, testified that Mr. Hager would have been eligible to be upgraded to fly Boeing 707 jet aircraft in July 1971, DC-10 jet aircraft in 1990 and 747 jet aircraft during the last three years prior to his mandatory retirement at age 60. The upgrading in equipment carried with it a corresponding pay increment for each aircraft of 8.7%, 11.2% and 12.7%, respectively. An executive administrator in charge of collective bargaining also testified that over a five-year period, the average annual increase received by pilots was approximately 6% and that since 1963, American Airlines had contributed to a noncontributory pension fund an amount equal to 17.1% of an employee's payroll. Plaintiff also offered upon the trial extensive testimony of an economist who projected decedent's gross earnings through retirement and computed the present value of Mr. Hager's pension benefits. My review of the proof leads me to the conclusion that the amount of damages awarded by the trial court for the wrongful death of decedent was excessive. Taking into account as elements of recoverable damages in an action for wrongful death, including the pecuniary loss sustained by the survivors, the wife's loss of services, society and companionship and the children's loss of parental care, training and guidance, I conclude that the wrongful death damage award should be reduced to the sum of $950,000, plus interest at the appropriate rate, computed from the date of decedent's death, December 2, 1969 (EPTL 5-4.3).

Accordingly, the judgment, Supreme Court, New York County (FRAIMAN, J.), entered March 1, 1977, should be modified to reduce the amount awarded as damages for the wrongful death of the decedent to the sum of $950,000, with interest at the appropriate legal rate from December 2, 1969, and, as so modified, affirmed, without costs and disbursements.

MARKEWICH and SULLIVAN, JJ., concur with LANE, J.; LUPIANO, J. P., and FEIN, J., dissent in separate opinions.

Judgment, Supreme Court, New York County, entered on March 1, 1977, reversed, on the law and the facts, and

vacated, and the complaint dismissed, without costs and without disbursements.